IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-259** |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| **WESLEY GARNER**, | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Wesley Garner moves to suppress physical evidence gathered and statements made during an encounter with law enforcement on November 14, 2018. For the following reasons, we will deny Garner's motion.

**I.    Factual Background**[1]

On the night of November 14, 2018, Officer Chad McGowan, a member of the Harrisburg Police Department's Street Crimes Unit, was patrolling the east end of Harrisburg in an unmarked police SUV, accompanied by two other police officers. (See 6/1/22 Tr. 6:5-24, 7:12-20, 27:8-14, 30:14-16). Around 10:00 p.m., while driving northbound at the intersection of North 15th and Herr Streets, Officer McGowan noticed a white 2018 Honda SUV with a New Hampshire license plate on the front bumper turn south onto 15th Street. (See id. at 11:9-20, 28:24-29:5). The driver, later identified as Garner, appeared to be alone. (See id. at 13:19-22, 25:13-23).

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the suppression hearing held in this matter on June 1, 2022. Citations to the June 1, 2022 hearing transcript are abbreviated as "6/1/22 Tr. ___." Hearing exhibits are cited as "Gov't Ex. __" and "Def. Ex. __." This recitation of facts reflects the court's determination that Officer McGowan—the only individual to testify as to the events of November 14, 2018—is generally credible.

Officer McGowan identified the Honda as a likely rental vehicle because of its uncommon license plate and noted it was operating in what he viewed to be "a very high drug area" where he had personally "been involved in foot pursuits, made criminal arrests," and "recovered firearms." (See id. at 8:17-9:11, 11:17-12:7, 13:8-17). Drawing on his training and experience, he knew individuals engaged in criminal activity frequently use rental vehicles for transportation because the vehicles help obscure the driver's identity and are less likely to suffer mechanical and documentation problems that draw law enforcement scrutiny. (See id. at 12:8-13:7, 13:24-14:6). Officer McGowan doubled back down 15th Street and attempted to tail the Honda but quickly lost track of it. (See id. at 14:2-6, 28:22-29:5). He then reconnoitered the neighborhood hoping to regain sight of the Honda. (See id. at 14:11-14).

Officer McGowan eventually spotted the Honda a few blocks away in Claster Alley, a narrow side street between 16th and 17th Streets. (See id. at 14:14-15:19; Def. Exs. 1A, 1B). The Honda was parked about halfway down the south side of the alley facing east with its lights off and its rear bumper sticking out into the alley. (See id. at 16:2-15, 17:20-22, 34:15-16). Officer McGowan decided to circle the block to view the Honda from behind, believing the vehicle had been parked in haste. (See id. at 16:9-12, 16:19-17:5). When he reached the other end of Claster Alley from 16th Street, he noticed the Honda's interior lights were still off but the brake lights were activated and the vehicle was "moving slightly." (See id. at 17:6-8). Officer McGowan surmised the driver was trying to reposition the vehicle and rounded the block once more before turning into the alley from 17th Street. (See id. at 17:8-22).

2

Officer McGowan parked his SUV on the north side of the alley several car lengths away from the Honda. (See id. at 17:23-18:3, 18:21-24, 34:17-35:2). At the suppression hearing, Officer McGowan testified he was unsure if he positioned his vehicle such that it completely blocked egress from Claster Alley, though he admitted the alley is narrow and attempting to drive around his SUV "would have been a tight fit." (See id. at 35:7-16; see also Def. Exs. 1A, 1B). He aimed his headlights on the Honda to illuminate its interior—thereby confirming Garner was the sole occupant—but did not activate his police lights or siren. (See 6/1/22 Tr. 17:23-18:6, 18:25-19:3, 35:17-19). He then exited his vehicle and, wearing a uniform that clearly identified him as a police officer, walked toward the Honda. (See id. at 9:25-10:11, 19:5, 39:4, 41:11-42:3).

After alighting from the SUV, Officer McGowan saw Garner "begin to bend over at his waist and begin to make several furtive movements" with his arms and hands. (See id. at 19:7-8; 35:25-36:3, 39:1-5). Office McGowan described the gestures as "very active" and "almost reaching movements," from which he inferred Garner might be retrieving or discarding something in response to the sudden appearance of a uniformed police officer. (See id. at 19:7-12, 35:25-36:6, 39:2-10). Alarmed that Garner could be reaching for a firearm, Officer McGowan ceased advancing toward the Honda and ordered Garner to show his hands. (See id. at 19:13-22, 26:12-18). Garner did not immediately comply, instead continuing the reaching movements and keeping his hands outside of Officer McGowan's line of sight. (See id. at 20:19-23, 26:14-16, 36:3-5, 38:13-39:3). Officer McGowan testified he repeated his command "several" times, emphasizing he "would have been screaming at that

3

point." (See id. at 20:5-7, 20:19, 26:3-6). After an unspecified but seemingly brief period of noncompliance, Garner raised his hands. (See id. at 20:19-23, 26:7-18).

Officer McGowan resumed his advance toward the Honda. (See id. at 26:16-17). As he reached the area immediately adjacent to the Honda, he detected the odor of marijuana emanating from the vehicle and asked Garner to step outside. (See id. at 20:25-21:4, 26:16-27:5). Garner complied. (See id. at 21:3-4). With the door open, it became "very apparent" to Officer McGowan the source of the marijuana odor was inside the Honda. (See id. at 21:1-3). He noticed a plastic bag containing what he immediately identified as marijuana lying in plain view on the driver's side floorboard within arms' reach of where Garner had been sitting. (See id. at 21:4-6, 21:14-22:19, 23:1-2).

Officer McGowan arrested Garner. (See id. at 22:20-24). At some point after Garner's arrest, two other officers joined Officer McGowan. (See id. at 40:21-23). McGowan searched Garner's person and vehicle. (See id. at 23:4-12). The search of Garner's person produced a bag of suspected crack cocaine and $319 in cash. (See id. at 23:6-7). As Officer McGowan seized the crack from Garner's pocket, Garner made a "spontaneous utterance" acknowledging his ownership of the drugs. (See id. at 25:1-3). The search of the Honda revealed, in addition to the bag of marijuana, a firearm lying on the passenger side floorboard, a marijuana cigarette in the ashtray, and a digital scale with suspected cocaine residue in the center console. (See id. at 24:4-10). After reading Garner his Miranda rights, Officer McGowan asked Garner several questions about the firearm found in the Honda. (See id. at 24:13-25:5). Garner initially denied any knowledge of the firearm's existence,

4

claiming it must have been left in the car by someone named "Jamal Brown" who Garner said had been a passenger in the vehicle immediately prior to Officer McGowan's arrival in Claster Alley. (See id. at 25:6-12). Officer McGowan replied that when he saw Honda passing through the intersection of 15th and Herr Streets, Garner was the sole occupant. (See id. at 25:13-15). Garner then "changed his story" and offered a new explanation of the firearm's presence, the details of which are not pertinent to the matter *sub judice*. (See id. at 25:15-16).

## II. Procedural History

A federal grand jury returned an indictment against Garner on August 14, 2019. Garner's prosecution is currently proceeding on a superseding indictment that charges him with a bevy of gun- and drug-related crimes, several of which arise out of the events of November 14, 2018. Garner moves to suppress statements made and physical evidence obtained during his encounter with Officer McGowan. We held a hearing on Garner's motion on June 1, 2022, and granted Garner and the government the opportunity to submit supplemental briefing. The motion is now fully briefed and ripe for disposition.

## III. Discussion

Garner argues the statements he made during his encounter with Officer McGowan on November 14, 2018, and the physical evidence acquired via the search of his vehicle and person must be suppressed because Officer McGowan seized him without reasonable suspicion he was engaged in criminal activity. (See Doc. 295 at 3). Generally, a warrantless seizure is unreasonable under the Fourth Amendment to the United States Constitution unless law enforcement possesses probable cause

to believe a crime has been committed and the person to be seized likely committed it. See Bailey v. United States, 568 U.S. 186, 192 (2013); United States v. Lowe, 791 F.3d 424, 430 (3d Cir. 2015). However, the Supreme Court of the United States carved an exception to this rule that permits a police officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)); accord Lowe, 791 F.3d at 430. Whether a detention was constitutionally permissible thus requires a fact-intensive inquiry into the reasonableness of a police officer's actions based upon the totality of the circumstances known to him. See Ohio v. Robinette, 519 U.S. 33, 39 (1996). Evidence obtained as the result of a Terry stop unsupported by reasonable suspicion "must be suppressed as 'fruit of the poisonous tree.'" See United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

The parties do not characterize the initial interaction in the matter *sub judice* as a Terry stop, but we find it to be one.[2] Hence, we must ascertain two things

---

[2] We note we confronted superficially similar circumstances in our opinion issued on today's date in United States v. Simmons, No. 1:22-CR-175, Doc. 56 (M.D. Pa. Jan. 11, 2023). In that case, officers stopped a pedestrian (defendant Andre Simmons) for the purpose of investigating a traffic violation immediately after Simmons had exited his vehicle; we assumed *arguendo* the encounter was a traffic stop for purposes of our Fourth Amendment analysis. See id. at 8-9. We differentiate the situation *sub judice* from Simmons in that Officer McGowan did not suspect Garner committed any sort of traffic infraction and only approached Garner sitting in a stationary, lawfully parked vehicle. See Johnson v. Campbell, 332 F.3d 199, 203, 205-06 (3d Cir. 2003) (applying Terry to investigatory stop of individual sitting in driver's seat of parked car); cf. United States v. Gibbs, 917 F.3d 1289, 1296 (11th Cir. 2019) (stop of pedestrian a traffic stop because purpose was to

6

before we can determine the admissibility of the evidence obtained incident to Garner's arrest: (1) the exact moment Officer McGowan seized Garner and (2) whether that seizure was supported by reasonable suspicion. See Lowe, 791 F.3d at 430 (quoting Campbell, 332 F.3d at 205). We will address these two issues *seriatim*.

### A. Seizure

The Fourth Amendment guarantees the "right of the people to be secure . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. Not all interactions between law enforcement and citizens constitute "seizures." See Florida v. Bostick, 501 U.S. 429, 434 (1991). An encounter with a police officer does not rise to the level of a seizure if "a reasonable person would feel free 'to disregard the police and go about his business.'" Id. (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Rather, law enforcement seizes a person only when they restrain an individual's freedom of movement via physical force or show of authority. See United States v. Mendenhall, 446 U.S. 544, 553 (1980); Lowe, 791 F.3d at 430 (quoting Brown, 448 F.3d at 245). When the seizure occurs depends upon the method of restraint. If the "seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force." Brown, 448 F.3d at 245 (quoting Hodari D., 499 U.S. at 626). But when officers do not use force, a seizure occurs only when the individual submits to the officers' authority. See id. at 245-46. If the individual never submits there is no seizure, only an "attempted seizure."

---

investigate a traffic violation); see also, e.g., United States v. Mosley, 743 F.3d 1317, 1325 (10th Cir. 2014) (framing stop of individual in a parked vehicle as a Terry stop); United States v. Young, 707 F.3d 598, 602-03 (6th Cir. 2012) (same).

7

See Lowe, 791 F.3d at 431 (citing Brendlin v. California, 551 U.S. 249, 254 (2007)); Brown, 448 F.3d at 245 (citing Hodari D., 499 U.S. at 626-27).

We conduct an objective analysis to determine when a show of authority takes place. See Vargas v. City of Philadelphia, 783 F.3d 962, 969 (3d Cir. 2015); Brown, 448 F.3d at 245. Considering "all of the circumstances surrounding the encounter," we must ask if "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Bostick, 501 U.S. at 437). Relevant factors include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" See id. at 630 (quoting Mendenhall, 446 U.S. at 554); Vargas, 783 F.3d at 969 (quoting same).

The point at which an individual submits to a show of authority, in contrast, turns upon subjective analysis of their conduct. See Lowe, 791 F.3d at 431-33; Brown, 448 F.3d at 246. A suspect fails to submit when he "takes action that clearly indicates that he 'does not yield' to the officers' show of authority," Lowe, 791 F.3d at 433 (quoting Hodari D., 499 U.S. at 626), such as fleeing after being ordered to halt, see id. (citing, *inter alia*, Wardlow, 528 U.S. at 121; Hodari D., 499 U.S. at 626). Certain other actions, like threatening an officer or making a suspicious movement consistent with reaching for a weapon, can also indicate failure to submit. See id. (citing, *inter alia*, United States v. Freeman, 735 F.3d 92, 95-97 (2d Cir. 2013); United States v. Waterman, 569 F.3d 144, 145 (3d Cir. 2009); United States v. Johnson, 212

8

F.3d 1313, 1316-17 (D.C. Cir. 2000)). Passive inaction, however, does not indicate failure to submit. See id. at 434. For example, our court of appeals held in Lowe that an individual who fails to immediately comply with an officer's order to "show hands" does not necessarily fail to submit to the officer's authority so long as their hands remain immobile, and they do not flee or make threatening movements or gestures. See id.

Garner insists he was seized when Officer McGowan parked his police vehicle in Claster Alley and effectively trapped Garner in the alley. (See Doc. 399 at 5 (citing United States v. See, 574 F.3d 309, 313 (6th Cir. 2009); United States v. Jones, 678 F.3d 293, 301 (4th Cir. 2012)). We disagree. Boxing in a vehicle can constitute seizure under certain circumstances, see, e.g., United States v. Hester, 910 F.3d 78, 86 (3d Cir. 2018); United States v. Edwards, 53 F.3d 616, 619-20 (3d Cir. 1995), but this is not such a situation. Officer McGowan parked his unmarked vehicle—the only other occupied vehicle present in the alley—several car lengths from Garner's Honda. (See 6/1/22 Tr. 18:21-22, 30:14-16, 34:10-35:2). He did not activate his lights or siren. (See id. at 18:3, 18:25-19:3, 35:17-19). From Garner's perspective, there was no immediate indication the SUV was anything but a civilian vehicle attempting to traverse the alley. A reasonable person in Garner's shoes would not have felt barred from putting his vehicle in reverse and either leaving the alley from 16th Street or repositioning to allow the oncoming vehicle to pass. See Kaupp, 538 U.S. at 629-30. A police officer in an unmarked vehicle no more seizes a civilian by parking near their car on a public thoroughfare than he does by walking near that civilian on the sidewalk dressed in street clothes. Cf. Bostick, 501 U.S. at

434 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place." (quoting Florida v. Royer, 460 U.S. 491, 497 (1983))); United States v. Williams, 413 F.3d 347, 352 (3d Cir. 2005).

We find the seizure occurred the moment Garner raised his hands in compliance with Officer McGowan's show-hands order. Officer McGowan's order was an unmistakable show of authority. See Lowe, 791 F.3d at 429-30, 432 (citing Waterman, 569 F.3d at 144-46); see also United States v. De Castro, 905 F.3d 676, 682 (3d Cir. 2018) (collecting cases discussing when request to show hands or remove hands from pockets constitutes show of authority). He repeatedly issued his command at high volume, eventually "screaming at" Garner. (See 6/1/22 Tr. 20:5-7, 20:19, 26:3-6); see also De Castro, 905 F.3d at 682 (citing United States v. Dubose, 579 F.3d 117, 119 (1st Cir. 2009)) (suggesting seizure occurs when individual ignores show-hands order and officer repeats order "in an increasingly loud voice"). Officer McGowan bore the uniform and insignia of a police officer. (See 6/1/22 Tr. 9:25-10:11, 39:4). No reasonable person would have felt free to drive or walk away from Claster Alley after hearing an officer scream at them an order to show hands. See Kaupp, 538 U.S. at 629-30.

Nevertheless, Garner did not immediately submit to Officer McGowan's command. Our court of appeals held in Lowe a suspect's failure to immediately raise their hands in response to a show-hands order does not constitute a *per se* failure to submit. See Lowe, 791 F.3d at 434. Testimony there established the defendant "froze[]" and "stayed put" in response to a show-hands order, with no

10

indication he "move[d] his hands or arms in any way." See id. The court was careful to distinguish action (which tends to show noncompliance) from inaction (which, by itself, does not). See id. at 433 ("Action—not passivity—has been the touchstone of our [submission] analysis.").

Garner's hands, *per contra*, were not immobile. Like the man who continues to flee after being ordered to halt, see Freeman, 735 F.3d at 95-97, Garner persisted in furtively moving his arms and hands beyond Officer McGowan's line of sight, (see 6/1/22 Tr. 20:19-23, 26:14-16, 36:3-5, 38:13-39:3). Under the circumstances, we find Garner's movements fall within the realm of actions indicative of refusing to submit to an officer's show of authority. See Lowe, 791 F.3d at 433-34; see also United States v. Mosley, 743 F.3d 1317, 1327 (10th Cir. 2014) (defendant seated in parked car seized after complying with show-hands order). The record is unclear as to how long Garner's noncompliance lasted, but so long as it lasted no seizure took place. See Lowe, 791 F.3d at 431; Brown, 448 F.3d at 245; see also Waterman, 569 F.3d at 146. Garner was seized for Fourth Amendment purposes only when he complied with Officer McGowan's command by showing his hands.

     **B.**     **Reasonable Suspicion**

Having determined the moment of seizure, we turn to the question of reasonable suspicion. Reasonable suspicion "is a less demanding standard than probable cause," but still requires "at least a minimal level of objective justification." Wardlow, 528 U.S. at 123. A seizure is supported by reasonable suspicion if the law enforcement officer can identify "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant

[the] intrusion." United States v. Navedo, 694 F.3d 463, 468 (3d Cir. 2012) (alteration in original) (quoting Terry, 392 U.S. at 30). In other words, the facts in the officer's awareness must "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

We "must consider the totality of the circumstances, including the police officer's knowledge, experience, and commonsense judgments about human behavior" when assessing the suspicion justifying an investigative detention. Id. (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)). We apply an objective standard, *i.e.*, whether "a reasonable, trained officer standing in the detaining officer's shoes could articulate specific reasons justifying the stop." Hester, 910 F.3d at 87 (internal quotation marks omitted). Our analysis "unequivocally demands" that the detaining officer demonstrate "a particularized and objective basis" upon which to suspect the individual detained of criminal activity. See Brown, 448 F.3d at 246 (citation omitted). Details that viewed separately might appear innocuous or inadequate to support reasonable suspicion may prove sufficient in the aggregate. See Hester, 910 F.3d at 87; see also United States v. Arvizu, 534 U.S. 266, 274 (2002) (courts should not engage in "divide-and-conquer analysis").

Courts assessing the reasonableness of a seizure may consider an individual's "conduct in the interval between the show of authority and the submission." See Lowe, 791 F.3d at 431 (citing Brendlin, 551 U.S. at 254). Particularly noteworthy are evasive actions or furtive movements indicative of attempts to hide contraband or

12

retrieve a weapon, see United States v. Moorefield, 111 F.3d 10, 13 (3d Cir. 1997) (collecting cases addressing significance of furtive movements within vehicle in reasonable-suspicion analysis), especially when they continue despite a police officer's order to stop, see United States v. Focareta, 283 F. App'x 78, 83 (3d Cir. 2008) (nonprecedential). We also look to behavior that conforms to known patterns of criminal activity in a particular area. See United States v. Nelson, 284 F.3d 472, 482 (3d Cir. 2002). And we may give weight to relevant characteristics of the neighborhood where the suspicious activity occurs, see Wardlow, 528 U.S. at 124 (citing Adams v. Williams, 407 U.S. 143, 144 (1972)), and the time of day when it occurs, see United States v. Goodrich, 450 F.3d 552, 561 (3d Cir. 2006) (citing Michigan v. Long, 463 U.S. 1032, 1050 (1983)).

Officer McGowan's seizure of Garner was informed by the following: Officer McGowan came upon Garner at night driving what appeared to be an out-of-state rental vehicle in an area of Harrisburg Officer McGowan knew from personal experience was "a very high drug area, an area where I have recovered firearms." (See 6/1/22 Tr. 8:8-9:11, 13:8-14). The ostensible rental vehicle was also cause for suspicion because Officer McGowan knew from his training and experience that individuals engaged in criminal activity often use rental vehicles as a means of evading law enforcement scrutiny. (See id. at 12:8-13:7). Garner responded to the presence of a uniformed officer by bending over and engaging in movements consistent with attempting to hide drugs, drug paraphernalia, or a weapon from police observation. (See id. at 19:7-12; 35:25-36:6, 39:1-5). Garner also disobeyed Officer McGowan's repeated orders to show hands by continuing to engage in

13

furtive movements, thereby placing Officer McGowan in reasonable fear for his safety and supporting the supposition that whatever Garner was attempting to hide was illegal. (See id. at 20:19-23, 26:3-6, 26:14-16, 36:1-6, 38:13-24). Garner's initial movements may have been consistent with innocent movements like stowing a cell phone or retrieving car keys. Cf. United States v. Bullock, 839 F. App'x 662, 665 (3d Cir. 2021) (nonprecedential). But when Garner continued those movements after Officer McGowan "scream[ed] at" him to stop, they lost that innocence. Considering all these factors and assigning them appropriate weight, we find Officer McGowan's seizure of Garner on November 14, 2018, was supported by reasonable suspicion Garner was engaged in criminal activity.

**V.     Conclusion**

Officer McGowan's seizure of Garner did not violate the Fourth Amendment. We will deny Garner's motion to suppress physical evidence gathered and statements made during his encounter with law enforcement on November 14, 2018. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   January 11, 2023