**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-259** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **WESLEY GARNER,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Defendant Wesley Garner moves to suppress evidence obtained by law enforcement in August 2019 during two successive searches of an apartment in Harrisburg, Pennsylvania.  We will deny Garner's motion.

**I.      <u>Factual Background</u>**

The government alleges Garner is a member of "Never Forget Loyalty" or "NFL," a drug-trafficking operation based in Harrisburg, Pennsylvania, that occasionally moonlighted as a rap group.  (<u>See</u> Doc. 39 ¶ 2(B)-(D)).  The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), along with several Pennsylvania law enforcement agencies, began investigating NFL in November 2018 after the group was allegedly involved in several shootings around Harrisburg.

(See Doc. 297-1, Ex. 1B ¶¶ 4-8).[1]  The investigation culminated in Magistrate Judge

Martin C. Carlson approving a series of warrants targeting NFL on August 14, 2019.

One of these warrants authorized law enforcement to search Apartment B at 22

Thomas Street in Harrisburg for evidence of drug trafficking, illegal possession

of firearms, and other items related to NFL's criminal activities.  (See Doc. 297-1,

Ex. 1A at 2, 5-6).  At the time, law enforcement believed Garner was residing in

Apartment B with his associate, Anderson Ortiz, an alleged gun and drug dealer

who was also targeted by the NFL investigation but does not appear to have been

an official member of the group.  (See Doc. 297-1, Ex. 1B ¶¶ 5, 7(c)-(d), 8(c)).

### A.    First Search[2]

At approximately 6:00 a.m. on August 15, 2019, law enforcement officers

under leadership of ATF Special Agent Jamie Markovchick executed the warrant

---

[1] Docket Entry 297-1 includes multiple exhibits as one omnibus filing.  We will cite to documents by their exhibit number.  Exhibit 1 contains two documents: a search warrant, (see Doc. 297-1 at 2-11), and the application for said warrant, (see id. at 12-65).  For ease of reference, we cite to the search warrant as Exhibit 1A and the application for the warrant as Exhibit 1B.  Exhibit 3 likewise contains two documents: a report of investigation pertaining to the second search of Apartment B at 22 Thomas Street, (see id. at 122-125), and a consent-to-search form, (see id. at 126).  We cite to the report as Exhibit 3A and the form as Exhibit 3B.  For all citations to exhibits contained within Docket Entry 297-1, we will cite to the ECF pagination or, if relevant, the applicable paragraph number within the exhibit.

[2] The following factual narrative derives from testimonial and documentary evidence adduced during the suppression hearings held in this matter on June 1 and July 12, 2022, respectively, together with exhibits attached to the parties' briefs.  Citations to the June 1, 2022 hearing transcript are abbreviated as "6/1/22 Tr. ___."  Citations to the July 12, 2022 hearing transcript are abbreviated as "7/12/22 Tr."  This recitation of facts reflects the court's credibility determinations.  Specifically, we find the testimony of Special Agents Jamie Markovchick, Bradley Davis, Ryan Anderson, and Brenda McDermott to be highly credible.

for Apartment B at 22 Thomas Street.  (See Doc. 297-1, Ex. 2 at 67; 6/1/22 Tr. 43:22-44:16).  The Dauphin County SWAT team entered Apartment B, which is on the building's second floor, arrested Garner, and secured the premises.  (See 6/1/22 Tr. 44:17-45:25).  A Harrisburg city police officer stationed himself at the bottom of the common stairwell to prevent anyone from interrupting the search.  (See id. at 48:11-16).  Agent Markovchick and his team then entered the unit, made an "entry video" documenting the state of the apartment per agency protocol, and began their search.  (See id. at 45:22-46:23).  Agents recovered, inter alia, a firearm, ammunition, drug paraphernalia, a modest quantity of marijuana, two baggies of suspected crack cocaine, and $3,171 in United States currency.  (See id. at 46:24-47:20; Doc. 297-1, Ex. 2 at 67-68).  The first baggie was relatively small, weighing only 17 grams.  (See Doc. 297-1, Ex. 2 at 68; 6/1/22 Tr. 47:7-9).  The second, found in the kitchen, was substantially larger and contained a quantity of suspected crack cocaine approximately the size of a baseball.  (See 6/1/22 Tr. 46:24-47:9).

Approximately the same time Agent Markovchick's team entered Apartment B, another group of officers executed a search warrant and arrested Ortiz at 32 Wetzel Street in the nearby borough of Highspire.  (See 7/12/22 Tr. 8:15-10:12).  Ortiz's then-girlfriend, Alayshia Jackson, was present at the time of his arrest.  (See id.)  The couple previously had lived together in Apartment B but recently moved to 32 Wetzel Street, which was the residence of Jackson's mother; Garner moved into Apartment B thereafter and paid rent to Jackson, who remained the named lessee.  (See id. at 4:7-5:7, 5:24-6:1, 8:4-6, 9:8-22).  Ortiz instructed Jackson to warn Garner

about his arrest and the search of 32 Wetzel Street.  (See id. at 9:23-10:7).  Jackson

drove to 22 Thomas Street to inform Garner in person.  (See id. at 10:1-22).

Jackson and a female companion arrived at 22 Thomas Street as the search

of Apartment B was underway.  (See 6/1/22 Tr. 48:4-8).  Unbeknownst to agents

conducting the search, the Harrisburg police officer guarding the stairwell had

vacated his post, allowing Jackson and her companion to enter the apartment

unimpeded and to surprise the officers mid-search.  (See id. at 48:2-22, 53:12-55:9;

Doc. 297-1, Ex. 2 at 68).  Agent Markovchick and the two women argued briefly:

Agent Markovchick ordered the women to leave the apartment; the women

demanded to know why agents were there.  (See 6/1/22 Tr. 48:23-49:5, 57:1-58:1,

59:12-14).  After Agent Markovchick explained he had a warrant authorizing law

enforcement to search the premises, he and Jackson shook hands, and Jackson

provided her driver's license and a copy of the lease agreement.  (See id. at 49:6-9,

57:22-58:1).  Investigators completed the search, made an "after video" of the

apartment, and at approximately 9:00 a.m., turned over the premises to Jackson as

the leaseholder.  (See id. at 47:23-25, 49:10-11, 50:9-14, 56:6-9; Doc. 297-1, Ex. 2 at 68).

### B.   Second Search

After returning to ATF's Harrisburg field office, Agent Markovchick and

Special Agent Bradley Davis of the Pennsylvania Attorney General's Office began

processing evidence seized from Apartment B.  (See 6/1/22 Tr. 49:24-50:3; 7/12/22 Tr.

37:6-38:10, 38:23-39:2).  While vacuum-sealing the suspected controlled substances,

they realized the baggie containing the baseball-sized quantity of crack cocaine was

missing.  (See 6/1/22 Tr. 50:3-7, 63:13-19; 7/12/22 Tr. 23:13-18, 46:14-22).  The pair

checked the videos taken during the search and concluded the search team left behind the suspected crack cocaine in the kitchen where it was originally found. (See 6/1/22 Tr. 50:14-20; see also Doc. 297-1, Ex. 3A at 122-23).

Agents Markovchick and Davis drove back to 22 Thomas Street at around 11:30 a.m. with two other ATF agents—Special Agents Ryan Anderson and Brenda McDermott—hoping to get Jackson's permission to reenter Apartment B and recover the baggie. (See 6/1/22 Tr. 51:4-11, 56:2-11, 63:20-22, 64:11-15; 7/12/22 Tr. 25:2-4; see also Doc. 297-1, Ex. 3A at 123). By coincidence, the agents reached 22 Thomas Street at roughly the same moment Jackson and her companion were returning to the apartment. (See 6/1/22 Tr. 51:12-17, 63:23-64:10; 7/12/22 Tr. 25:4-12, 40:5-15). The agents approached Jackson outside of the apartment building, with Agents Markovchick and Anderson standing close to Jackson and Agents Davis and McDermott standing a few feet away. (See 6/1/22 Tr. 64:16-21; 7/12/22 Tr. 25:6-17, 40:20-24, 47:14-23). The agents wore street clothes and carried firearms. (See 7/12/22 Tr. 33:15-24).

The agents informed Jackson they had "left something behind by mistake" and asked whether Jackson would allow them back inside to retrieve this "illegal item." (See 6/1/22 Tr. 60:14-16; 7/12/22 Tr. 41:20-42:15, 48:12-49:24). Agent Anderson clarified the item left behind was, in fact, a bag containing suspected crack cocaine. (See 6/1/22 Tr. 66:18-24; 7/12/22 Tr. 35:12-36:10). He also advised Jackson she could decline consent, but officers would then "hold the residence" and apply for another warrant. (See 6/1/22 Tr. 64:24-65:5). The conversation between the agents and

Jackson was casual and nonthreatening: the agents described it as "calm,"

"cordial," and "laid back."  (See 7/12/22 Tr. 28:19-29:2, 41:3-19, 44:23-45:1).

Jackson provided oral consent for the agents to reenter the apartment and

collect the baggie.  (See 6/1/22 Tr. 51:20-21, 61:5-9, 65:6-11; 7/12/22 Tr. 26:2-5, 34:19-

35:3, 43:6-10, 50:10-15).  She refused, however, to sign a consent form offered by

Agent Anderson, for fear of connecting herself to the recovered drugs.  (See 6/1/22

Tr. 61:5-9, 65:15-18; 7/12/22 Tr. 28:5-10, 44:4-16; Doc. 297-1, Ex. 3B at 126).  Despite

the agents' assurances to the contrary, Jackson thought signing the form could

"somehow implicate her in what was recovered," so she was unwilling to reduce her

verbal consent to writing.  (See 7/12/22 Tr. 44:4-16).  Agent Anderson explained:

> She said yes.  We provided her with a consent form to
> sign.  I remember her putting her hands up like this and
> saying, "I'm not signing anything.  I want nothing to do
> with what was found in there," and we said, "Will you
> allow us back in?"  She said yes.

(See 6/1/22 Tr. 61:5-9).

Agent Anderson wrote "refused to sign" in the form's signature box.  (See

6/1/22 Tr. 65:20-21; Doc. 297-1, Ex. 3B at 126).  Jackson then accompanied the agents

into the building and up the stairs to Apartment B, where she unlocked the door

and allowed them to enter the apartment.  (See 6/1/22 Tr. 61:5-11, 68:9-11; 7/12/22

Tr. 26:16-21, 35:1-2, 42:23-24, 43:9-13).  Agents Markovchick and McDermott entered

the apartment, promptly recovered the baggie of suspected crack cocaine from the

kitchen, took a photograph for their records, and left 22 Thomas Street.  (See 6/1/22

Tr. 61:11-13, 65:11-14; 7/12/22 Tr. 26:22-27:5).

II.   **Procedural History**

On the same day Judge Carlson issued the search warrant for Apartment B, a federal grand jury returned an indictment against Garner, Ortiz, and several other members of the NFL drug-trafficking ring.  The prosecution of NFL is currently proceeding on a superseding indictment that charges Garner with a bevy of gun- and drug-related crimes.  Garner moves to suppress evidence acquired during the two searches of Apartment B on August 15, 2019.  We held a hearing on Garner's motion on June 1, 2022, but kept the record open to afford him additional time to locate Jackson, who he considered to be a material witness.  We held a second hearing on July 12, 2022.  Jackson testified at this hearing, and we thereafter permitted supplemental briefing.  The motion is now fully briefed and ripe for disposition.

III.   **Discussion**

Garner mounts two constitutional challenges to the evidence gathered during the searches of Apartment B.  (<u>See</u> Doc. 297 at 3).  We address Garner's challenges *seriatim.*

A.   **Warrant for First Search**

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  <u>See</u> U.S. CONST. amend. IV; <u>Horton v. California</u>, 496 U.S. 128, 133 (1990).  To search a home, the constitutional default is that a warrant is required.  <u>See</u> <u>Payton v. New York</u>, 445 U.S. 573, 586 & n.25 (1980) (citations omitted).  For a search warrant to issue, a neutral magistrate must find, under the totality of the circumstances, that "there is a fair probability

that contraband or evidence of a crime will be found in a particular place."  <u>See</u>
<u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  Courts reviewing such determinations
do not make a *de novo* probable cause assessment; they "simply []ensure that the
magistrate had a substantial basis for . . . concluding that probable cause existed."
<u>United States v. Miknevich</u>, 638 F.3d 178, 182 (3d Cir. 2011) (alteration in original)
(quoting <u>Gates</u>, 462 U.S. at 238-39).

The Supreme Court of the United States views probable cause as an
amorphous concept, "not readily, or even usefully, reduced to a neat set of legal
rules."  <u>See</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 695-96 (1996) (quoting <u>Gates</u>, 462
U.S. at 232).  Its existence must be determined from the view of the officer on the
street, not the judge in the courtroom.  <u>See</u> <u>United States v. Sokolow</u>, 490 U.S. 1, 7-8
(1989); <u>see also</u> <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981).  Whether probable
cause exists is an objective determination based on the totality of the circumstances
present at the time of the challenged governmental conduct.  <u>See</u> <u>United States
v. Williams</u>, 413 F.3d 347, 353 n.6 (3d Cir. 2005).  Probable cause "is not a high bar."
<u>Kaley v. United States</u>, 571 U.S. 320, 338 (2014).

A reviewing court must read the affidavit supporting a warrant application
"in its entirety and in a commonsense and nontechnical manner."  <u>See</u> <u>United
States v. Conley</u>, 4 F.3d 1200, 1206 (3d Cir. 1993) (citing <u>Gates</u>, 462 U.S. at 230-31);
<u>Miknevich</u>, 638 F.3d at 182.  When reasonable minds might differ as to whether
an affidavit established probable cause, the court must give "great deference to a
magistrate's determination."  <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984)
(citations and internal quotation marks omitted); <u>United States v. Stearn</u>, 597 F.3d

540, 549 (3d Cir. 2010).  So long as the affidavit *sub judice* contains a "substantial basis" for finding probable cause that evidence of either Garner's or Ortiz's criminal activity would be found inside Apartment B, the warrant is valid.  See Miknevich, 638 F.3d at 182.

The applications for the NFL warrants were supported by the same 49-page affidavit of probable cause authored by ATF Special Agent LaToya Stewart.  (See Doc. 297-1, Ex. 1B).  Agent Stewart attests she has worked for ATF for approximately two years and is a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program and ATF Special Agent Basic Training.  (See id. ¶ 1).  In relevant part, she avers as follows:

- ATF and Harrisburg Police Department are jointly investigating the NFL "drug trafficking gang," which posted several music videos on YouTube depicting its members "displaying large sums of cash, narcotics, and firearms," including "pistols with high capacity magazines, AR-15 style rifles," and a semiautomatic rifle modeled on the AK-47.  (See id. ¶¶ 4, 42 & n.9).

- NFL illegally distributes crack cocaine, heroin, fentanyl, and marijuana. Its members are known to carry firearms and have been involved in drug-related shootings around Harrisburg.  (See id. ¶¶ 5, 11, 34, 36).

- Garner is a member of NFL and goes by the nickname "Sosa."  He serves as the gang's "enforcer" and supplies the organization with narcotics and firearms.  (See id. ¶¶ 5, 7(c)).

- Garner was convicted in 2013 and 2015 of crimes punishable by a term of imprisonment greater than one year.  (See id. ¶ 7(c)).

- Garner is associated with Anderson Ortiz, also known as "Lil Sosa," who distributes firearms and narcotics on Garner's behalf.  Investigators "established through surveillance and information provided by Law Enforcement that Ortiz currently resides at 22 Thomas Street Apt. B, Harrisburg Pennsylvania."  Ortiz, like Garner, is a convicted felon.  (See id. ¶¶ 7(d), 87).

- Agent Stewart believes Garner maintains two residences: one at 606 North 17th Street in Harrisburg, and another with Ortiz in Apartment B on the second floor of the apartment building at 22 Thomas Street.  (See id. ¶¶ 8(b)-(c), 27, 77).

- Garner was arrested on November 14, 2018, in Harrisburg, in possession of controlled substances and a "fully-loaded" pistol with a high-capacity magazine.[3]  (See id. ¶ 10).

- Investigators obtained a search warrant for a cell phone belonging to Qushawn Brown, the leader of NFL.  The cell phone contained text messages from November 15, 2018, between Brown and Alayshia Bowman, in which Brown states he gave Garner (referred to by a nickname) an iPhone so "he can jug," which Agent Stewart explains is slang for selling narcotics.  (See id. ¶¶ 5, 17).

- According to phone records obtained by law enforcement, Brown utilized two different cell phone numbers to maintain "consistent contact" with Garner.  (See id. ¶¶ 20, 26, 83-84).

- Garner used a recorded jailhouse phone line the day after his November 14 arrest to communicate with Bowman, who told Garner "someone broke into Garner's room after his arrest" and "his money, televisions and 'jawns' are missing."  Bowman suspected the items were taken by Billy Edwards, the owner of 606 North 17th Street.  Garner directed Bowman to initiate a three-way call with Edwards so Garner could confront him about the missing property.  Garner asked Edwards about the location of his "situations," which Agent Stewart explains is slang for firearms.  Edwards denied breaking into Garner's room; he informed Garner that Brown had taken one of the "situations" in question.  (See id. ¶ 27).

- Garner was released from jail on December 3, 2018.  (See id. ¶ 27 n.5).

- Garner is believed to be the intended target of two shootings in the Harrisburg area in late 2018, one in mid-November and another on December 28.  (See Doc. 297-1, Ex. 1B ¶¶ 12, 34).

- Investigators obtained a recording of a phone call between Brown and Garner made on January 5, 2019, in which the two discussed a separate shooting in Harrisburg.  During the conversation, Garner proclaimed, "I need a gun at all times!"  (See id. ¶ 36).

---

[3] Garner's November 14, 2018 arrest is also the subject of a motion to suppress, (see Doc. 294), addressed in a separate opinion issued on January 11, 2023, (see Doc. 419).

- On May 7, 2019, Pennsylvania State Police conducted a controlled purchase of a $50 quantity of heroin from Ortiz using a confidential informant. (See id. ¶ 41).

- Pennsylvania State Police conducted a second controlled purchase of heroin from Ortiz on May 14, 2019. During the purchase, law enforcement observed Ortiz leave 22 Thomas Street. (See id. ¶ 44).

- Investigators observed Garner retrieve something from the hood of a red Cadillac on May 23, 2019, and conduct a hand exchange with Brown. Agent Stewart explains drug traffickers commonly hide contraband under the hoods of vehicles. (See id. ¶ 45).

- On May 27, 2019, investigators watched surveillance footage of Garner hiding a suspected firearm in the hood of a blue Jetta before driving away in the Jetta. Garner and the Jetta later appeared in surveillance footage taken the same day outside 1621 Market Street, the locus of NFL's drug-trafficking operation. In this latter footage, Garner exits the Jetta and conducts a hand exchange with Christopher Miller. Garner and Miller swap vehicles and drive away separately. Agent Stewart explains drug traffickers commonly change their vehicles to conceal their activities. (See id. ¶¶ 7(b), 32, 40, 43, 46-47, 76-77).

- On May 28, 2019, a confidential source ("CS-4") informed investigators Ortiz is a heroin dealer and asserted they had personally made purchases from Ortiz. CS-4 also described Ortiz regularly possessing a "handgun with a long clip" in his car or on his person when providing the source with heroin. (See id. ¶ 48).

- On May 30, 2019, a different confidential source ("CS-5") informed investigators Garner was in possession of "two mini Draco pistols, a FN 57 pistol, 2-3 Glock pistols and a black and grey in color F&K 9mm pistol" and had sent CS-5 Snapchat posts depicting those firearms. (See id. ¶ 49).

- On June 21, 2019, another confidential source ("CS-1") reported Garner "was packaging heroin behind" 1621 Market Street. (See id. ¶ 53).

- On July 8, 2019, ATF conducted a controlled purchase of a $100 quantity of heroin from Ortiz using CS-4. (See id. ¶ 56).

- Law enforcement observed Garner exit a vehicle and enter 22 Thomas Street on July 25, 2019. (See id. ¶ 64).

- Another confidential source ("CS-8") informed investigators on July 25, 2019, Garner was currently "staying with Ortiz" at Ortiz's "spot" behind the "Choice Mini mart" and the residence contained "a firearm and

'dope,'" which Agent Stewart explains refers to heroin.  She further reports the apartment building at 22 Thomas Street is situated "behind the 2500 Block of Market Street where the Choice Mini Mart is located." (See id. ¶ 65).

- Investigators surveilling 22 Thomas Street on August 2, 2019, saw Garner exit the apartment around noon and walk across the street.  He returned a few minutes later and sat on the steps outside the building while talking on a cell phone.  At 12:36 p.m., Garner left the building again, got into a vehicle, and drove away.  (See id. ¶ 68).

- CS-8 "corroborated information that Ortiz stores contraband at 22 Thomas Street Apt. B; which investigators confirmed during controlled purchases and surveillance of Ortiz in and around 22 Thomas Street." (See id. ¶ 77).

- CS-1 informed investigators on May 7, 2019, Garner was "out of town" conducting a "pick up."  Historical cell site data obtained by law enforcement corroborated this information, placing a cell phone utilized by Garner in Mobile, Alabama, between May 7 and May 8, 2019.  (See id. ¶ 82 & n.12).

- Pen register data shows Brown called or received calls from Garner approximately 62 times between May 16 and May 30, 2019, and Ortiz called or received calls from Garner approximately 35 times between July 10 and July 20, 2019.  (See id. ¶¶ 84-85).

Garner attacks Agent Stewart's affidavit on several grounds.  He claims the affidavit fails to establish probable cause because (1) it fails to sufficiently link Garner and Ortiz's criminal activity to the apartment building at 22 Thomas Street as a whole, (see Doc. 297 at 4-5); (2) it fails to connect Garner and Ortiz's criminal activity to Apartment B specifically, (see id. at 5-6); and (3) it does not adequately explain the sources of facts averred, preventing the magistrate from assessing the credibility of the information, (see id. at 6-7).  Garner also seeks a Franks hearing to explore what he alleges are material falsehoods in and omissions from the affidavit. (See id. at 7-8).

### 1.      *Probable Cause to Search 22 Thomas Street*

To satisfy the Fourth Amendment, an affidavit of probable cause must establish a nexus between the crime alleged and the place to be searched.  See Stearn, 597 F.3d at 558.  The nexus inquiry is a "common-sense" assessment based on all facts averred in the affidavit; no single factor controls.  See id. at 554, 559-60 (quoting Gates, 462 U.S. at 238).  The magistrate judge therefore may make "normal inferences about where a criminal might hide [evidence]" or contraband.  See id. at 554 (alteration in original) (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)).

Our court of appeals has long recognized "drug dealers often store evidence of drug crimes in their residences," see id. at 559 (quoting United States v. Burton, 288 F.3d 91, 104 (3d Cir. 2002)), particularly when those dealings are "on a significant scale or for an extended period of time," see United States v. Williams, 974 F.3d 320, 351 (3d Cir. 2020) (citing United States v. Hodge, 246 F.3d 301, 306 (3d Cir. 2001); United States v. Whitner, 219 F.3d 289, 297-98 (3d Cir. 2000)).  Still, an affidavit of probable cause must offer some evidence "linking the targeted location to the suspect's drug activities"—merely alleging the defendant is a drug dealer and the targeted location is his residence will not suffice.  See Williams, 974 F.3d at 351 (quoting Burton, 288 F.3d at 104) (emphasis and brackets omitted).  Similarly, in the context of firearms crimes, it is beyond peradventure an affidavit establishing both that an individual is illegally possessing firearms and a nexus between that

possession and the individual's home provides probable cause to search that residence.  See Jones, 994 F.2d at 1056-57.[4]

Agent Stewart's affidavit contains ample, cross-corroborated information regarding Garner and Ortiz's suspected drug dealing and firearms crimes.  That information includes, *inter alia*, that Garner packaged heroin at 1621 Market Street and maintained a stash house at 606 North 17th Street (two locations affiliated with the NFL conspiracy), and travelled interstate to "pick up," (see id. ¶¶ 53, 65, 82 & n.12); that Ortiz participated in three controlled sales of heroin, (see id. ¶¶ 41, 44, 56); that investigators observed Garner engaging in conduct consistent with drug dealing on multiple occasions (two hand-to-hand exchanges, swapping vehicles, and retrieving items stored under a vehicle's hood), (see id. ¶¶ 45, 47); that Brown told another associate he had given Garner a cell phone to deal drugs, (see id. ¶ 17); and that Garner had engaged in a "consistent and sustained" pattern of cell phone

---

[4] The court in Jones did not need to determine "whether in *every* case the fact that a suspect committed a crime involving . . . a gun automatically provides a magistrate with enough information to approve a search of a suspect's home."  See Jones, 994 F.2d at 1056 (emphasis added).  Courts in this circuit, including a panel of our court of appeals in a nonprecedential opinion, have suggested the answer to that inquiry might be yes.  See, e.g., United States v. Hopkins, 220 F. App'x 155, 158 (3d Cir. 2007) (nonprecedential) (finding nexus without direct connection because evidence sought, a firearm used in an assault, is "of the type typically stored in a perpetrator's residence" (citing Jones, 994 F.2d at 1056)); United States v. Golden, No. 19-545, 2020 WL 2848183, at *4-5 (E.D. Pa. June 2, 2020) (finding probable cause to search previously convicted felon's residence based on averment he was seen in Instagram video brandishing revolver in vehicle).  Like the court in Jones, we need not address this question because Agent Stewart's affidavit provides sufficient facts to establish a nexus between Garner's and Ortiz's possession of firearms and their residence.

communication with Brown, Ortiz, and other drug dealers within the NFL drug-trafficking organization, (see id. ¶¶ 20, 26, 83-86).

As for firearms offenses, Agent Stewart notes Garner and Ortiz are both convicted felons. (See id. ¶¶ 7(c), 87)). Accordingly, possession of a firearm by either is a federal crime. See 18 U.S.C. § 922(g)(1). The affidavit is replete with information establishing Garner's possession of firearms, including information from confidential sources (one of whom attributed at least a half dozen specific firearms to Garner); a recorded jailhouse phone conversation in which Garner asked, in coded language, about the location of his firearms; and a relatively recent arrest where he was found in possession of a firearm. (See Doc. 297-1, Ex. 1B ¶¶ 27, 49, 51, 65).[5] So too for Ortiz: CS-4 reported Ortiz habitually carries a handgun and had one on his person while dealing heroin, (see id. ¶ 48), which violates both the felon-in-possession statute and the statute barring use of firearms in furtherance of drug-trafficking offenses, see 18 U.S.C. §§ 922(g), 924(c).

The affidavit also provides information connecting Garner and Ortiz, and their suspected drug and firearm crimes, to 22 Thomas Street. A law enforcement tip, corroborated by CS-8, reported Garner and Ortiz reside together at 22 Thomas Street. (See Doc. 297-1, Ex. 1B ¶¶ 7(d), 65, 77). Law enforcement observed Ortiz

---

[5] Agent Stewart avers surveillance footage captured Garner concealing a "black object" under the hood of a car which Garner held "like a firearm." (See Doc. 297-1, Ex. 1B ¶ 46). Garner challenges this averment as false in a separate pending motion to suppress and seeks a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). (See Doc. 299 at 7-9). Garner does not challenge the averment with regard to this motion, but, out of an abundance of caution, we exclude the challenged statement from our probable cause analysis.

leaving 22 Thomas Street during one of the controlled heroin buys. (See id. ¶¶ 41, 44, 56). And surveillance revealed Garner freely coming and going from 22 Thomas Street on several occasions. (See id. ¶¶ 64, 68). A reasonable magistrate could fairly conclude, from the totality of the information in the affidavit, that 22 Thomas Street was one of several residences utilized by the NFL conspiracy, and by Garner and Ortiz specifically, to traffic controlled substances, and therefore that evidence of drug trafficking likely would be found in that residence. See Stearn, 597 F.3d at 559; Hodge, 246 F.3d at 306; see also United States v. Sarraga-Solana, 263 F. App'x 227, 230-31 (3d Cir. 2008) (nonprecedential) (no "direct evidence of drug activity" required so long as affidavit demonstrates "circumstantial connection between . . . residence and a pattern of drug activity").[6]

The affidavit also establishes evidence of Garner and Ortiz's illegal firearm possession—i.e., the firearms—is likely to be found in their residence. See Jones, 994 F.2d at 1056-57. Garner's comment to Brown—"I need a gun at all times"— suggests he intended the firearms for self-defense and permits the reasonable inference firearms may be stored in his residence for protection; indeed, Agent Stewart's affidavit reveals Garner's statement came on the heels of two shootings in which he was believed to be the intended target. (See Doc. 297-1, Ex. 1B ¶¶ 12, 34, 36). In another recorded phone conversation, Garner spoke about firearms stored in his other residence at 606 North 17th Street; that Garner kept firearms in one of

---

[6] The court acknowledges that nonprecedential decisions are not binding upon federal district courts. Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

his residences increases the likelihood he also kept firearms in his residence at 22 Thomas Street.  (See id. ¶¶ 27, 51).  Ultimately, however, Judge Carlson did not need to make those inferences to find probable cause, because he had information directly placing firearms in Garner and Ortiz's residence at 22 Thomas Street, viz.: CS-8's report to investigators that 22 Thomas Street contained both "a firearm and 'dope.'"  (See id. ¶ 65).  Independent of any drug trafficking, a reasonable magistrate could find probable cause to believe 22 Thomas Street contained evidence of Garner or Ortiz illegally possessing firearms.  For all these reasons, we will deny Garner's motion to suppress on this ground.

### 2.    *Probable Cause to Search Apartment B*

Garner next claims Agent Stewart's affidavit fails to establish probable cause to search Apartment B specifically.  (See Doc. 297 at 5-6).  The particularity clause of the Fourth Amendment places two requirements on a warrant targeted at a specific unit in an apartment building.  First, the warrant must specifically identify the unit to be searched.  See United States v. Busk, 693 F.2d 28, 30 (3d Cir. 1982) (quoting United States v. Bedford, 519 F.2d 650, 654-55 (3d Cir. 1975)); United States v. Hargraves, No. 2:19-CR-182, 2022 WL 499864, at *25 (W.D. Pa. Feb. 18, 2022) (collecting cases).  Second, the warrant must be supported by probable cause to believe the specific unit to be searched contains evidence of a crime; probable cause to believe criminal activity is afoot in the building generally is insufficient.  Cf. Busk, 693 F.2d at 31 (citing, inter alia, United States v. Higgins, 428 F.2d 232 (7th Cir. 1970); United States v. Hinton, 219 F.2d 324 (7th Cir. 1955)); see Hinton, 219 F.2d at 325-26 ("The showing of probable cause and the particularity of the

description . . . must be considered together, for the scope of the warrant to search is dependent upon the extent of the showing of probable cause.").

The warrant indisputably meets the first component of the particularity analysis. It specifies precisely the apartment to be searched: "22 Thomas Street, Apartment 'B.'" (Doc. 297-1, Ex. 1A at 2). Garner claims it is the second component on which the affidavit falls short: that it fails to establish probable cause to search Apartment B in particular. (See Doc. 297 at 5-7). We are not convinced the affidavit is deficient in this respect. It arguably provides sufficient information from which Judge Carlson could find Apartment B was Ortiz's (and through Ortiz, Garner's) residence: Agent Stewart attests information provided by law enforcement[7] and through surveillance established Ortiz resides in Apartment B, information CS-8 subsequently corroborated, and she reports CS-8 relayed Garner was staying with Ortiz. (See Doc. 297-1, Ex. 1B ¶¶ 7(d), 77). We need not resolve this closer question because even if we assume *arguendo* the affidavit fails to establish probable cause specific to Apartment B, the evidence obtained via the warrant is admissible through the good-faith exception.

Courts will not suppress evidence obtained through a subsequently invalidated search warrant if officers acted in good faith, that is, "in the objectively

---

[7] The government explains in its brief that the tip from "Law Enforcement" derives from an incident where police and firefighters entered Apartment B in response to reports of a domestic disturbance and fire. (See Doc. 316 at 12 n.1). No one was present in the apartment at the time police entered, but officers noticed Ortiz's Pennsylvania identification card in plain view on a dresser. (See id.) This information, however, cannot be considered in our probable cause analysis, as the government frankly acknowledges. (See id. (citing Jones, 994 F.2d at 1055)).

reasonable belief that their conduct did not violate the Fourth Amendment." <u>See</u> <u>Leon</u>, 468 U.S. 897 at 918; <u>Stearn</u>, 597 F.3d at 560 (quoting <u>Leon</u>, 468 U.S. at 918). The test is "whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization." <u>Hodge</u>, 246 F.3d at 307 (quoting <u>United States v. Loy</u>, 191 F.3d 360, 367 (3d Cir. 1999) (quoting <u>Leon</u>, 468 U.S. at 922 n.23)). Our court of appeals has recognized four "rare" exceptions to this rule, only one of which is relevant here: evidence will be suppressed if "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[8] <u>See</u> <u>Pavulak</u>, 700 F.3d at 664  (quoting <u>Stearn</u>, 597 F.3d at 561 & n.19 (internal quotation marks and citations omitted)).

Agent Stewart's belief that probable cause existed to support searching Apartment B was entirely reasonable under the circumstances. The only ostensible flaw in the affidavit as pertains to Apartment B is the information connecting Ortiz to that specific apartment is somewhat vague. But the affidavit is not devoid of information making that connection. As noted *supra*, Agent Stewart cites both "surveillance and information provided by Law Enforcement" as the basis for her belief Ortiz resides at "22 Thomas Street Apt. B, Harrisburg Pennsylvania," and she asserts that information was corroborated by CS-8. (<u>See</u> Doc. 297-1, Ex. 1B ¶¶ 7(d),

---

[8] A second exception applies when "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit." <u>See</u> <u>United States v. Pavulak</u>, 700 F.3d 651, 664 (3d Cir. 2012) (quoting <u>Stearn</u>, 597 F.3d at 561 & n.19 (internal quotation marks and citations omitted)). We find *infra* that Garner has not shown the affidavit contains any deliberate or reckless falsehoods.

77).  The consummate affidavit might have offered greater detail about how sources acquired their knowledge or the nature of claimed corroboration; "elaborate specificity," however, is not the standard.  <u>See</u> <u>Gates</u>, 462 U.S. at 235 (observing affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation" (quoting <u>United States v. Ventresca</u>, 380 U.S. 102, 108 (1965))).  We likewise find no flaw in the conduct of officers executing the warrant; the warrant appeared valid on its face and officers executing it would have had no reason to suspect Agent Stewart's comprehensive, 49-page affidavit failed to sufficiently connect the place to be searched with the suspects who supposedly resided there.  <u>See</u> <u>Hodge</u>, 246 F.3d at 308 (noting "mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception" (citing <u>Leon</u>, 468 U.S. at 922)).  The warrant authorizing the search of Apartment B falls squarely within the class of facially valid warrants the good-faith exception is intended to protect.

Moreover, the Supreme Court has explained "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  <u>Davis v. United States</u>, 564 U.S. 229, 238 (2011) (quoting <u>Herring v. United States</u>, 555 U.S. 135, 143 (2009)).  The sanction of exclusion "is appropriate only where law enforcement conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the costs of suppression."  <u>United States v. Katzin</u>, 769 F.3d 163, 171 (3d Cir. 2014) (quoting <u>Herring</u>, 555 U.S. at 144).  As a general rule, only when law enforcement officers "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" will the deterrent

value of exclusion "tend[] to outweigh the resulting costs." <u>Davis</u>, 564 U.S. at 238,

(quoting <u>Herring</u>, 555 U.S. at 144) (internal quotation marks omitted).  Exclusion

would net no deterrent benefit here.  There is no indication Agent Stewart or the

officers executing the warrant acted with deliberate, reckless, or grossly negligent

disregard for the Fourth Amendment; *per contra*, Agent Stewart prepared what, to

a nonlawyer, appeared to be a thorough and constitutionally adequate affidavit of

probable cause.  Exclusion of the evidence under these circumstances would be

inappropriate.  We will deny Garner's motion to suppress on this basis.

### 3. *Sources of Information*

Garner further asserts the affidavit fails to sufficiently identify the sources of

the information it relies upon, particularly the information connecting Garner and

Ortiz to Apartment B.  (<u>See</u> Doc. 297 at 6-7).  The source of an affiant's knowledge

about a suspect is relevant to the probable cause analysis.  <u>See</u> <u>Gates</u>, 462 U.S. at

238-39.  Nonetheless, it is only one factor of many a magistrate must consider before

making the probable cause determination.  <u>See</u> <u>id.</u>  Existence of probable cause

turns not on the presence or absence of one particular factor but on the totality of

the circumstances in each case.  <u>See</u> <u>id.</u> at 238-39, 241-46.  Most relevant to Garner's

arguments, "[i]t is enough, for purposes of assessing probable cause, that

corroboration through other sources of information reduced the chances of a

reckless or prevaricating tale, thus providing a substantial basis for crediting the

hearsay."  <u>See</u> <u>id.</u> at 244-45 (citation and internal quotation marks omitted).

As already discussed at length, the information linking Garner and Ortiz to

Apartment B comes from two sources: "Law Enforcement" and CS-8.  (<u>See</u> Doc.

297-1, Ex. 1B ¶¶ 7(d), 65, 77).  Agent Stewart does not disclose the basis of CS-8's knowledge about Garner and Ortiz's dealings, but that lack of detail did not deny Judge Carlson the ability to assess the credibility of the *information* CS-8 provided. All material information supplied by CS-8—regarding Ortiz's place of residence, possession of a controlled substance and a firearm, and cohabitation with Garner— is corroborated by police surveillance, controlled buys, and statements of other informants.  As the Supreme Court has noted, when an "informant is right about some things, he is more probably right about other facts."  See Gates, 462 U.S. at 244 (citation omitted).  A reasonable magistrate could easily assess the credibility of CS-8's information by looking to corroborating and contextual information contained in the affidavit.

We similarly assess the information provided to Agent Stewart by "Law Enforcement."  (See Doc. 297-1, Ex. 1B ¶¶ 7(d)).  The consensus among courts is that "information received from other law enforcement officials during the course of an investigation" is generally entitled to a presumption of reliability.  See Yusuf, 461 F.3d at 385 (collecting cases).  Judge Carlson reasonably could have viewed this presumption as applying to information "Law Enforcement" provided to Agent Stewart even when the specific agency is not identified, particularly given that the source's information is consistent with CS-8's statements and surveillance placing Garner and Ortiz in and around 22 Thomas Street.  The totality of the affidavit is sufficient to allow an adequate credibility assessment.  See Gates, 462 U.S. 213 at 238-39.  We will deny Garner's motion to suppress on this basis.

4.     *__Franks__ Hearing*

Garner also seeks a __Franks__ hearing regarding certain aspects of Agent Stewart's affidavit.  (__See__ Doc. 297 at 7-9).  A criminal defendant may challenge the truthfulness of factual statements contained in an affidavit of probable cause through what is commonly referred to as a __Franks__ hearing.  __See generally__ __Franks v. Delaware__, 438 U.S. 154 (1978).  The mere allegation an affidavit is misleading is not enough to obtain a __Franks__ hearing.  __See__ __Pavulak__, 700 F.3d at 665.  A defendant must first make "a substantial preliminary showing" that the affiant knowingly or recklessly included a materially false statement in, or omitted material information from, the affidavit of probable cause.  __See__ __United States v. Aviles__, 938 F.3d 503, 508 (3d Cir. 2019) (quoting __Franks__, 438 U.S. at 155–56).  However, if the challenged information is immaterial—that is, unnecessary to the probable cause finding—no hearing is required.  __See__ __id.__ at 508-09.  When assessing the materiality of alleged falsehoods or omissions, courts "must perform a word-by-word reconstruction of the affidavit" to determine whether the reconstructed affidavit still would suffice to establish probable cause.  __See__ __Dempsey v. Bucknell Univ.__, 834 F.3d 457, 470 (3d Cir. 2016).

Crucially, the preliminary showing must be accompanied by "an offer of proof" supporting the request for a hearing.  __See__ __Franks__, 438 U.S. at 171; __United States v. Desu__, 23 F.4th 224, 234 (3d Cir. 2022) (citing __Yusuf__, 461 F.3d at 383 n.8).  This offer "cannot rest on mere conclusory allegations or a mere desire to cross-examine."  __Desu__, 23 F.4th at 234 (internal quotation marks omitted) (quoting __Yusuf__, 461 F.3d at 383 n.8).  Rather, the defendant must present evidence contradicting the

affidavit, "including materials such as sworn affidavits or otherwise reliable statements from witnesses," or else adequately explain the absence of such proof. See Franks, 438 U.S. at 171; Yusuf, 461 F.3d at 383 n.8 (citing Franks, 438 U.S. at 171); see also Desu, 23 F.4th at 234 (citing Yusuf, 461 F.3d at 383 n.8).  It is not enough to show a source relied upon by the affiant lied; the affiant themself must be shown to have intentionally or recklessly misled the court.  See Franks, 438 U.S. at 171; United States v. Brown, 3 F.3d 673, 677 (3d Cir. 1993).  Proof the affiant was negligent or made an innocent mistake is also insufficient.  See Franks, 438 U.S. at 171; Yusuf, 461 F.3d at 383 (quoting Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)).

Garner alleges paragraph 77 is misleading because it overstates the corroboration provided by CS-8.  (See Doc. 297 at 7-8 (citing Doc. 297-1, Ex. 1B ¶¶ 65, 77)).  As a threshold matter, Garner's brief is devoid of allegation—much less proof—suggesting Agent Stewart knowingly, intentionally, or recklessly attempted to mislead Judge Carlson in drafting her affidavit.  (See generally id.)  This defect alone fells Garner's request for a Franks hearing.  See United States v. Stiso, 708 F. App'x 749, 754 (3d Cir. 2017) (no Franks hearing when defendant  "has not provided anything to show that the supposed problems . . . were the product of knowing falsehoods or a reckless disregard for the truth"); United States v. Rivera, 524 F. App'x 821, 826 (3d Cir. 2013) (nonprecedential) (same when defendant "offered no evidence" affiant "either knew that the information was not true or recklessly disregarded its falsity").

Moreover, we reject Garner's self-serving interpretation of the affidavit. Paragraph 77 states, in relevant part, "CS-8 also corroborated information that ORTIZ stores contraband at 22 Thomas Street Apt. B." (See Doc. 297-1, Ex. 1B ¶ 77).  There is no dissonance between this paragraph (which references Apartment B specifically) and the information provided by CS-8 in Paragraph 65 (which does not).  The paragraphs are easily reconciled: Agent Stewart's affidavit on the whole suggests she derived her belief that Ortiz lives in Apartment B from information provided by law enforcement in Paragraph 7(d); she merely asserts in Paragraph 77 that CS-8 supplied information supporting that belief.  (See id. ¶¶ 7(d), 65, 77).  CS-8 indisputably provided such information: they place Garner in Ortiz's "spot" and situate said spot at a location consistent with 22 Thomas Street.  (See id. ¶ 65).

Garner also claims Agent Stewart omitted information related to the confidential sources' criminal histories and incentives for cooperating.  (See Doc. 297 at 9).  Garner's argument again fails at the first prong: he offers no proof such information exists, let alone that Agent Stewart knew of and either intentionally or recklessly omitted it from the affidavit.  See Stiso, 708 F. App'x at 754; Rivera, 524 F. App'x at 826.  Additionally, the law does not support Garner's suggestion that a source's criminal history is *always* material to the probable cause analysis.  To be sure, there are circumstances in which officers must affirmatively disclose information bearing on a source's credibility.  See, e.g., United States v. Coles, 552 F. Supp. 3d 471, 486 n.13 (M.D. Pa. 2021) (Conner, J.) (citing United States v. Glover, 755 F.3d 811, 817 (7th Cir. 2014)); United States v. Larnerd, 514 F. Supp. 3d 660, 669, 675-76 (M.D. Pa. 2021) (Wilson, J.).  In Coles, for example, we held a magistrate

25

judge would want to know a key source of information had failed his own polygraph test the day before he spoke with detectives and was himself a prime suspect in the investigation.  See Coles, 552 F. Supp. 3d at 486 n.13.  Background information of a more generalized nature, however, like that conjectured by Garner, can fairly be presumed.  See, e.g., United States v. Woodfork, 999 F.3d 511, 517 (7th Cir. 2021) (magistrate could infer informant purchasing methamphetamine "likely had some criminal history" and motivation for cooperating).  Garner has not shown the information he claims is missing from Agent Stewart's affidavit—"information . . . regarding the criminal histories of the confidential informants or what incentive they had to participate"—would materially change the probable cause analysis, nor that its absence somehow denied Judge Carlson the ability to assess the informants' credibility.

For all of these reasons, we conclude Garner has not made the substantial preliminary showing necessary to merit a Franks hearing.

### B.   Consent to Second Search

Garner also contends officers violated the Fourth Amendment when they returned to Apartment B to retrieve evidence inadvertently left behind following their first search.  Warrantless searches "are *per se* unreasonable—subject only to a few specifically established and well-delineated exceptions."  See United States v. Mallory, 765 F.3d 373, 382 (3d Cir. 2014) (citation omitted).  A search conducted with consent constitutes one such exception.  See United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003).  Police may conduct a search with consent that is "freely and voluntarily given."  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (citing

<u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968)).  Consent is not voluntary, however, if provided under duress or as a result of coercion.  <u>See id.</u> at 227.  The government bears the burden of proving consent by a preponderance of the evidence.  <u>See</u> <u>United States v. Morales</u>, 861 F.2d 396, 399 (3d Cir. 1988) (citing <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974)).

We find by a preponderance of the evidence Jackson verbally consented to the second search, thereby rendering the search permissible under the Fourth Amendment.[9]  <u>See</u> <u>Schneckloth</u>, 412 U.S. at 222; <u>Morales</u>, 861 F.2d at 399.  Multiple law enforcement agents testified credibly that Jackson gave clear, verbal consent for them to reenter the apartment and retrieve the forgotten evidence.  According to the agents, Jackson verbally agreed to let them reenter the unit, escorted them upstairs, and unlocked the door to the apartment to allow them inside.  Jackson's hesitation was not in allowing agents inside the apartment but in signing the consent form itself; having just seen her former residence searched and her boyfriend arrested, she feared reducing her consent to writing could somehow implicate her for the contraband found in the apartment and earn her the same fate.  The agents' testimony on these key points— about how the events unfolded, and their perception of Jackson's concerns and motivations—was consistent and convincing.

---

[9] The government argues the second search of Apartment B is permissible under the original warrant regardless of whether Jackson consented.  (<u>See</u> Doc. 316 at 21).  As we find Jackson consented to the second search, we need not reach this argument.

Jackson's narrative, by contrast, was difficult to parse and to believe. Her demeanor was nervous and faltering. She talked in circles and evaded direct answers to questions. (See, e.g., 7/12/22 Tr. 6:2-7:18, 9:23-12:4, 17:4-18:5, 19:8-22, 20:12-21:15). Interestingly, she testified the agents thanked her upon leaving the apartment, a communication which would be rather inconsistent with her version of events. (See id. at 16:25-17:1). For the reasons set forth herein, we do not credit Jackson's testimony over the candid, persuasive, and consistent account given by the four agents. Accordingly, we find the government has met its burden under the totality of the circumstances to show Jackson freely and voluntarily consented to the second search of Apartment B at 22 Thomas Street.[10]

---

[10] Garner argues, in the alternative, that even if Jackson consented to the second search, her "consent was not intelligent and voluntary." (See Doc. 399 at 12-15). Our court of appeals rejects any "talismanic definition of 'voluntariness,'" and, thus, instructs district courts to examine "the totality of the circumstances" when determining whether an individual freely and voluntarily consented to a search. See United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009) (quoting Schneckloth, 412 U.S. at 224, 227). Relevant factors include information about the individual and the character of the interaction itself. See id. (second alteration in original) (quoting Givan, 320 F.3d at 459). The record before us does not reveal any of the signature characteristics of involuntariness; there was no hostile pattern of interaction, threat of punishment, or intimidating show or use of force. Cf. United States v. Williams, 898 F.3d 323, 332 (3d Cir. 2018). Jackson testified to being "shooken up" and "all over the place" at the time of her conversation with the agents, (see 7/12/22 Tr. 7:21-24), but feeling flustered does not deprive one of the ability to knowingly consent. Nor does the suggestion the agents might hold Apartment B constitute coercion. Cf. United States v. Hynson, 451 F. App'x 91, 95 (3d Cir. 2011) (nonprecedential) (threat of arrest insufficient to categorically render consent involuntary); see also United States v. Tompkins, 130 F.3d 117, 119, 122 & n.25 (5th Cir. 1997) (barring individual from hotel room not coercion). The record does not support Garner's contention; Jackson freely and voluntarily consented.

IV.    **Conclusion**

For the reasons set forth herein, we will deny Garner's motion to suppress the evidence gathered on August 15, 2019, from Apartment B at 22 Thomas Street. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 19, 2023