**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-259** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **WESLEY GARNER,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Defendant Wesley Garner moves to suppress evidence obtained by law enforcement in August of 2019 during the search of an unregistered rooming house located in Harrisburg, Pennsylvania.  For the following reasons, we will grant in part and deny in part Garner's motion.

**I.    Factual Background & Procedural History[1]**

The government alleges Garner is a member of "Never Forget Loyalty" or "NFL," a drug-trafficking operation based in Harrisburg, Pennsylvania which occasionally moonlighted as a rap group.  (See Doc. 39 ¶ 2(A)-(D)).  The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), along with several Pennsylvania law enforcement agencies, began investigating NFL in November of

---

[1] The following factual narrative derives from testimonial, documentary, and video evidence adduced during the suppression hearing in this matter held on February 9, 2023, together with the parties' briefing and attached exhibits. Citations to the February 9, 2023 hearing transcript are abbreviated as "2/9/23 Tr. ___."  Citations to the two video recordings made by law enforcement documenting the August 15, 2019 search of 606 North 17th Street are abbreviated as "Before Rec. __" and "After Rec. __" respectively.  This recitation of facts reflects the court's credibility determinations.  We find the testimony of Agent Stewart to be credible. We also find Garner's testimony to be credible insofar as it relates to his living situation at 606 North 17th Street.

2018 after the group was allegedly involved in several shootings around Harrisburg. (See Doc. 299-1, Ex. 1B ¶¶ 4-6).[2]  This investigation culminated in investigators applying for a series of warrants targeting NFL.  One of these applications sought a warrant to search a residence located at 606 North 17th Street in Harrisburg for evidence of drug trafficking, illegal possession of firearms, and other items related to NFL's alleged criminal activities.  (See Doc. 299-1, Ex. 1B at 12, 62-64).

ATF Special Agent LaToya Stewart served as the lead case agent on the NFL investigation and authored the affidavit of probable cause supporting the application for the NFL search warrants.  (See 2/9/23 Tr. 11:10-14, 11:18-12:2; Doc. 299-1, Ex. 1B at 12-13).  The application describes 606 North 17th Street as "a single family home" in the text of the affidavit, (see Doc. 299-1, Ex. 1B ¶ 8(b)), and as "a brick single family home with a large window [with] white molding located on the second floor" in an attachment identifying the location to be searched, (see id., attach. A at 62).

At the time of the investigation, Agent Stewart and her colleagues understood 606 North 17th Street to be a rooming house operated by Billy Edwards, (see 2/9/23 Tr. 35:7-13, 38:7-16, 39:20-21), and "believed . . . Garner had a room [at 606 North 17th Street] and him and his co-conspirators used this room at this

---

[2] Docket Entry 299-1 includes multiple exhibits as one omnibus filing.  We will cite to documents by their exhibit number.  Exhibit 1 contains two documents: a search warrant, (see Doc. 299-1 at 2-11), and the application for said warrant, (see id. at 12-65).  For ease of reference, we cite to the search warrant as Exhibit 1A and the application for the warrant as Exhibit 1B.  For all citations to exhibits contained within Docket Entry 299-1, we will cite to the ECF pagination or, if relevant, the applicable paragraph number(s) within the exhibit.

residence," (id. at 13:12-14).  This belief was based on information investigators obtained from a confidential source and a recorded phone call Garner made from jail.  (See Doc. 299-1, Ex. 1B ¶¶ 27, 65; 2/9/23 Tr. 34:22-35:16, 39:21-22).  City records, however, categorized the residence as a "one-unit single-family dwelling"—not as a rooming house or any other type of multifamily dwelling.  (See 2/9/23 Tr. 6:17-7:12). Agent Stewart relied on these records when identifying the residence as a single-family home in the application for the search warrant.  (See id. at 13:15-17, 13:23-14:10, 40:19-22).  Investigators confirmed the city records via surveillance; Agent Stewart explained "[w]hen we conducted surveillance, it looked like a single-unit dwelling.  There were no multiple mailboxes.  There were people that accessed the front and the back, but we had no knowledge of the actual layout of the residence until the day of the search warrant."  (See id. at 13:18-22).  Magistrate Judge Martin C. Carlson approved the warrant on August 14, 2019, authorizing investigators to conduct a no-knock search of 606 North 17th Street.  (See Doc. 299-1, Ex. 1A).  The warrant included the attachment identifying the residence as "a brick single family home."  (See id., attach. A at 4).

The parties now agree 606 North 17th Street was not a single-family home at the time of the search; it was a multi-unit dwelling.  (See Doc. 435 at 1; Doc. 436 at 13).  Specifically, Edwards rented individual bedrooms under separate leases.  (See 2/9/23 Tr. 16:2-3, 27:23-25; Doc. 299-1, Ex. 2 at 67; see also id. at 44:12-22, 46:21-24). The residents had exclusive dominion over their bedrooms, (see 2/9/23 Tr. 44:25-45:4, 46:21-47:22), but shared a common kitchen and bathrooms, (see id. at 19:21-24, 19:12-13; Before Rec. 01:00-01:02, 02:09-02:13, 02:20-02:23; After Rec. 00:51-00:54,

02:04-02:17).  Each bedroom was separately identified by a large, black number affixed to its door.  (See 2/9/23 Tr. 15:20-21, 19:13-14, 31:4-5; Doc. 299-1, Ex. 2 at 67; Def. Exs. 2-5;[3] Before Rec. 00:36).  At least some of the doors bore prominent deadbolt locks.  (See After Rec. 01:07-01:08, 01:23-01:25, 01:28-01:29).

On August 5, 2019, a Pennsylvania State Police entry team executed the no-knock warrant.  (See Doc. 299-1, Ex. 2 at 67; 2/9/23 Tr. 14:11-21).  The entry team conducted a security sweep of the residence, forcibly opening the door to each room, while Agent Stewart and her colleagues waited nearby.  (See 2/9/23 Tr. 14: 20-24, 15:11-13, 15:18-20, 17:10-16, 39:9-16; After Rec. 00:16, 00:27, 00:43-00:45, 01:58-01:59).  The entry team detained eight individuals and observed several weapons inside the residence.  (See Doc. 299-1, Ex. 2 at 67; 2/9/23 Tr. 14:24-15:1, 15:22, 16:13-17:3).  They spotted a handgun sitting in plain view on the bed inside the bedroom marked with the number four ("Room 4").  (See 2/9/23 Tr. 15:2-4, 16:13-23; Doc. 299-1, Ex. 2 at 67-68).  They also found an AK-47 stowed in the closet of Room 4.  (See 2/9/23 Tr. 15:2-4, 16:13-23; see also Doc. 299-1, Ex. 2 at 67-68).  In the bedroom marked with the number three ("Room 3"), they also spotted an additional handgun in plain view on a chair.  (See 2/9/23 Tr. 16:24-17:2; Doc. 299-1, Ex. 2 at 67-68).  Rooms 3 and 4 were unoccupied at the time of the search.  (See Doc. 299-1, Ex. 2 at

---

[3] These exhibits consist of photographs of the doors to various bedrooms in 606 North 17th Street.  The photographs depict the doors as being affixed with both large, black numbers and pieces of paper printed with various letters.  Agent Stewart explains these pieces of paper were added by investigators during the course of the search.  (See, e.g., 2/9/23 Tr. 31:6-32:1)

67).  Neither Garner nor Edwards were present at 606 North 17th Street at the time the warrant's execution.  (See id.)

After securing the premises and reporting their findings, the entry team turned over the premises to Agent Stewart and her team.  (See 2/9/23 Tr. 14:23-15:18).  Agent Stewart noticed several details about the residence after entering, namely, the numbers on the doors, the shared bathroom on the second floor, and the common kitchen on the first floor.  (See id. at 15:20-21, 19:7-24).  She also noticed the residence lacked multiple mailboxes either internally or externally.  (See id. at 39:3-8; see also id. at 13:18-19).

Investigators eventually gathered the detained occupants together and advised them of their respective rights under Miranda v. Arizona, 384 U.S. 436 (1966).  (See id. at 15:22-24; Doc. 299-1, Ex. 2 at 67).  All occupants claimed to reside at 606 North 17th Street in rooms rented from Edwards.  (See 2/9/23 Tr. 16:2-3, 27:23-25; Doc. 299-1, Ex. 2 at 67).  They identified Room 3 as belonging to Edwards but denied knowledge of who resided in Room 4 or who owned the firearms found in that room.  (See 2/9/23 Tr. 16:6-11; Doc. 299-1, Ex. 2 at 67).  The parties now agree, however, Room 4 belonged to Garner who was renting the room from Edwards for $150 a week under an individual lease.  (See 2/9/23 Tr. 44:12-22, 46:21-24).  Garner primarily lived with his girlfriend at another location but would occasionally spend the night in Room 4.  (See id. at 44:23-45:18, 46:10-12).

Investigators proceeded to search the entire residence, including Room 4.  (See Doc. 299-1, Ex. 2 at 67-69; 2/9/23 Tr. 17:7-21).  According to Agent Stewart, Room 4 was a spartan affair containing only a modicum of furniture—a bed, a table,

a nightstand, a TV—but no household appliances associated with food preparation like a refrigerator, stove, or hotplate.  (See 2/9/23 Tr. 18:5-19:5, 38:22-39:2).  The search of Room 4 revealed, in addition to the handgun and AK-47, some ammunition; blenders containing what appeared to be narcotic residue; some clothing, including a pair of red sweatpants belonging to Garner; and a photograph an agent recognized as being of Garner's son.  (See 2/9/23 Tr. 17:22-18:22; Doc. 299-1, Ex. 2 at 68-69).  In addition to the materials seized from Room 4, investigators discovered some small quantities of marijuana, suspected drug paraphernalia, and a substantial amount of currency throughout the rest of the dwelling.  (See Doc. 299-1, Ex. 2 at 67-69).  They also seized a digital video recording system from Room 3 containing footage taken by the dwelling's security cameras.  (See id. at 68; see also 2/9/23 Tr. 21:17-21).  Agent Stewart described this footage as depicting Garner and some of his co-defendants entering the residence and Room 4 during the preceding months.  (See 2/9/23 Tr. 21:17-23:11).  Consistent with ATF protocol, investigators filmed two videos capturing the state of the residence before and after their search.  (See 2/9/23 Tr. 20:5-9; see also Before Rec.; After Rec.).

The same day Judge Carlson issued the warrant authorizing the search of 606 North 17th Street, a federal grand jury returned an indictment against Garner and several other members of the NFL drug-trafficking ring.  The prosecution of NFL is currently proceeding on a superseding indictment which charges Garner with certain gun- and drug-related crimes.  Garner now moves to suppress the evidence obtained from Room 4 on the ground the search of 606 North 17th Street violated

6

his Fourth Amendment rights.  We held a hearing regarding Garner's motion on February 9, 2023.  The motion is now fully briefed and ready for disposition.

II.    **Discussion**

Garner advances a threefold challenge to the evidence obtained via the search of 606 North 17th Street.  First, he asserts the affidavit supporting the warrant application failed to establish probable cause.  Second, he contends the warrant failed to satisfy the Fourth Amendment's particularity clause.  Third, he argues the execution of the warrant exceeded the bounds of what was reasonable under the Fourth Amendment.  We will address these claims *seriatim*.[4]

A.    **Probable Cause**

The Fourth Amendment ensures people are "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990).  To search a home, the constitutional default is a warrant is required.  See Payton v. New York, 445 U.S. 573, 586 & n.25 (1980) (citations omitted).  For a search warrant to issue, a neutral magistrate must find, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  See Illinois v. Gates, 462 U.S. 213, 238 (1983).  Courts reviewing such determinations do not make a *de novo* probable cause assessment; they "simply . . . ensure that the magistrate had a substantial basis for . . . concluding that probable

---

[4] The government initially asserted Garner lacked the privacy interest in 606 North 17th Street necessary to challenge the warrant or search at issue.  (See Doc. 236 at 2-3).  The government now concedes the testimony and evidence adduced at the hearing established Garner's privacy interest in Room 4.  (See Doc. 436 at 8).

cause existed." United States v. Miknevich, 638 F.3d 178, 182 (3d Cir. 2011) (second alteration in original) (quoting Gates, 462 U.S. at 238-39).

The Supreme Court of the United States views probable cause as an amorphous concept, "not readily, or even usefully, reduced to a neat set of legal rules." See Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Gates, 462 U.S. at 232). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 449 U.S. 411, 418 (1981). Whether probable cause exists is an objective determination based on the totality of the circumstances present at the time of the challenged governmental conduct. See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005). Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014).

Judge Carlson's finding that probable cause existed to search 606 North 17th Street relied on Agent Stewart's thorough affidavit. Affidavits supporting probable cause "must be read in [their] entirety and in a common sense and nontechnical manner." See United States v. Conley, 4 F.3d 1200, 1206 (3d Cir. 1993) (citing Gates, 462 U.S. at 230-31); Miknevich, 638 F.3d at 182. When reasonable minds might differ as to an affidavit's ability to support probable cause, the reviewing court must give "great deference to a magistrate's determination." See United States v. Leon, 468 U.S. 897, 914 (1984) (citations and quotation marks omitted); United States v. Stearn, 597 F.3d 540, 549 (3d Cir. 2010).

We have no difficulty finding Agent Stewart's affidavit provided a substantial basis for Judge Carlson to find probable cause to search 606 North 17th Street. The

affidavit avers Garner is a convicted felon, (see Doc. 299-1, Ex. 1B ¶¶ 7(c), 87), and felons, of course, are prohibited from possessing firearms, see 18 U.S.C. § 922(g). The affidavit contains ample averments connecting Garner, the illegal possession of firearms, and 606 North 17th Street.[5]  One confidential source ("CS-5") told investigators on May 30, 2019, Garner sent them Snapchat messages showing Garner to be in possession of "two mini Draco pistols, a FN 57 pistol, 2-3 Glock pistols and a black and grey in color F&K 9mm pistol."  (See Doc. 299-1, Ex. 1B ¶ 49).  CS-5 additionally informed investigators Garner "has a stash house on N. 17th and Liberty Streets"; Agent Stewart explains that intersection is just one-half block from 606 North 17th Street.  (See id.)  Another confidential source ("CS-6") relayed on June 7, 2019, Garner was storing firearms "in a room in the area of N. 17th and Liberty Streets."  (See id. ¶ 51).  A third confidential informant ("CS-8") offered more corroborative detail on July 25, 2019, telling investigators Garner was maintaining a "stash house in the area of N. 17th and Liberty Streets in a rooming house owned by Billy Edwards."  (See id. ¶ 65).

---

[5] One piece of evidence cited in Agent Stewart's affidavit to link Garner to firearms is surveillance footage depicting Garner concealing beneath the hood of a vehicle an object Agent Stewart says Garner held "like a firearm."  (See Doc. 299-1, Ex. 1B ¶ 46).  Garner asserts this description is false and misleading; he claims the object is square, and he requests a Franks hearing to ascertain if Agent Stewart included this falsehood in the affidavit intentionally or recklessly.  (See Doc. 299 at 7-9 (citing Franks v. Delaware, 438 U.S. 154 (1978)).  We find no Franks hearing is necessary because Agent Stewart's description of the object is immaterial; the affidavit suffices to establish probable cause without this evidence, and we exclude it from our analysis.  See United States v. Aviles, 938 F.3d 503, 508-09 (3d Cir. 2019); Dempsey v. Bucknell Univ., 834 F.3d 457, 470 (3d Cir. 2016).

The affidavit also avers Harrisburg police arrested Garner on November 14, 2018, following a traffic stop "next to" 606 North 17th Street and found him to be in possession of controlled substances and a "fully loaded" pistol with a high-capacity magazine. (See id. ¶ 10 & n.1). The day after the arrest, Garner used a recorded jailhouse phone line to communicate with Edwards, the owner of 606 North 17th Street, about the whereabouts of certain property Garner suspected had been stolen from his room after the arrest. (See id. ¶ 27). Garner asked Edwards about the location of his "situations," which Agent Stewart explains is slang for firearms. (See id.) Edwards denied breaking into Garner's room and informed Garner a particular member of NFL had one of the "situations" in question. (See id.)

The phone call between Garner and Edwards along with CS-5's tip directly support finding Garner was keeping illegal firearms in his room at 606 North 17th Street. (See id. ¶¶ 27, 51). Investigators repeatedly confirmed Garner's association with 606 North 17th Street and NFL's use of the residence as a "stash house" using informants and surveillance in the months and weeks preceding the warrant application. (See id. ¶¶ 49, 51-52, 65, 67). Three confidential informants reported to investigators Garner and NFL were using 606 North 17th Street as a "stash house." (See id. ¶¶ 49, 51, 65). Investigators also conducted a controlled purchase of heroin from Garner's associate Anderson Ortiz; Ortiz entered and exited 606 North 17th Street shortly before completing the transaction. (See id. ¶¶ 8(b), 9, 41, 44, 48, 56). The affidavit thoroughly established probable cause to search 606 North 17th Street

for evidence of both drug-trafficking and firearm crimes.[6]  We will deny Garner's

motion to suppress on this basis.

###    B.    Particularity Clause

The Fourth Amendment requires all warrants to "particularly describe[] the

place to be searched, and the persons or things to be seized."  Groh v. Ramirez, 540

U.S. 551, 557 (2004) (quoting U.S. CONST. amend. IV) (emphasis omitted).  This

requirement "not only prevents general searches, but also 'assures the individual

whose property is searched or seized of the lawful authority of the executing officer,

his need to search, and the limits of his power to search.'"  United States v. Ritter,

416 F.3d 256, 265 (3d Cir. 2005) (quoting United States v. Chadwick, 433 U.S. 1, 9

(1977)).  Relevant sub judice, the particularity clause demands law enforcement

narrow the scope of warrants so as to exclude any place for which they lack

probable cause to search.  See Maryland v. Garrison, 480 U.S. 79, 84-85 (1987);

United States v. Laury, No. 21-2703, 2022 WL 17091120, at *2 (3d Cir. Nov. 21, 2022)

(nonprecedential) (citing Garrison, 480 U.S. at 84-85), cert. denied, 143 S. Ct. 1041

(2023).  For example, a warrant targeted at a particular unit in an apartment

---

[6] Garner argues Agent Stewart's affidavit fails to articulate sufficient
information supporting the reliability of the confidential informants because she
neglected to describe the sources of their information or assert the informants are
known to be reliable.  (See Doc. 299 at 9-10).  We disagree.  Even hearsay and
anonymous tips can support probable cause as long as those tips are corroborated
by other sources of information.  See Gates, 462 U.S. at 241-45.  Each tip connecting
606 North 17th Street to illegal activity is corroborated by the statements of the
other informants, police surveillance, a controlled buy, a recorded phone call, and
Garner's nearby arrest while in possession of an illegal firearm.  The totality of the
affidavit is sufficient to allow a reasonable magistrate to adequately assess
reliability of the confidential informants.  See id. at 238.

building must specify the unit to be searched; if it does not, the warrant generally is invalid.  <u>See</u> <u>United States v. Busk</u>, 693 F.2d 28, 30 (3d Cir. 1982) (quoting <u>United States v. Bedford</u>, 519 F.2d 650, 654-55 (3d Cir. 1975)); <u>see also</u> <u>United States v. Hargraves</u>, No. 2:19-CR-182, 2022 WL 499864, at *25 (W.D. Pa. Feb. 18, 2022) (collecting cases).

Occasionally, law enforcement officers obtain a warrant believing a location to be a single-family residence only to discover during the search that the location actually contains multiple units.  <u>See, e.g.</u>, <u>Garrison</u>, 480 U.S. at 84-86; <u>Ritter</u>, 416 F.3d at 264-66.  Nevertheless, "the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant," <u>Garrison</u>, 480 U.S. at 85, as long as "the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances," <u>Ritter</u>, 416 F.3d at 266 (citing <u>Garrison</u>, 480 U.S. at 86).  Stated differently, the warrant is only invalid *ab initio* when, at the time of application, investigators knew or should have known there were multiple units at the address to be searched and failed to disclose, or to discover and disclose, this vital fact to the magistrate.  <u>See</u> <u>Garrison</u>, 480 U.S. at 85-86; <u>Ritter</u>, 416 F.3d at 266; <u>see also</u> <u>Laury</u>, 2022 WL 17091120, at *2 (citing <u>Ritter</u>, 416 F.3d at 266).

Garner contends the warrant issued by Judge Carlson was invalid *ab initio* because investigators described 606 North 17th Street as a single-family home in the application despite knowing it contained multiple units.  (<u>See</u> Doc. 299 at 6-7; <u>see also</u> Doc. 435 at 8-9).  Agent Stewart did know 606 North 17th Street to be a "rooming house" before she authored the warrant application.  (<u>See</u> 2/9/23 Tr. 35:7-

13, 38:7-16, 39:20-21).  However, having a belief that 606 North 17th Street was some type of "rooming house" does not necessarily equate with knowing it was a "multi-unit dwelling," a phrase with distinct legal meaning.  There is no categorical distinction between rooming houses and single-family residences for purposes of the Fourth Amendment's particularity clause.  *Per contra*, courts frequently find houses with rooming arrangements—including multiple individuals renting bedrooms from a single landlord—to be single-family residences.  See, e.g., Durham v. McElynn, 254 F. App'x 892, 896 (3d Cir. 2007) (nonprecedential) (presence of roommate does not "convert . . . single-family home into an apartment house or multi-unit building"); United States v. Kaplan, No. 06-719, 2010 WL 3620345, at *9-10 (E.D. Pa. Sept. 13, 2010) (citing Durham 254 F. App'x at 896), aff'd, 526 F. App'x 208 (3d Cir. 2013) (nonprecedential); United States v. Davis, No. 4:16-CR-0006, 2016 WL 7042976, at *2 (M.D. Pa. July 6, 2016) (same); see also, e.g., United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991) (separate bedroom does not constitute separate residence); United States v. McLellan, 792 F.3d 200, 204, 206, 212-14 (1st Cir. 2015) (renting out bedroom does not inherently render house a multi-unit dwelling); United States v. Schwinn, 376 F. App'x 974, 981 (11th Cir. 2010) (nonprecedential) (same); United States v. Esterline, 287 F. App'x 693, 695-96, 699 (10th Cir. 2008) (nonprecedential) (trailer homes fused together into continuous structure constituted single-family residence because of common living areas).  When individuals are renting rooms within a house, the line between single-unit and multi-unit dwelling depends on myriad factual particulars regarding the

structure and its occupants' living situations.  Agent Stewart evoked this ambiguity

during her testimony:

> Q: And you didn't know anything about individual leases
> for these separate numbered rooms prior to the execution
> of the warrant?
>
> A: Correct.  All we found out was it was a rooming house
> owned by Mr. Edwards.  We knew that Mr. Garner had a
> room based off of prison calls that we listened to.  But we
> didn't know the extent of how it was set up as far as was
> he just renting a room or was it—to the extent of what we
> saw when we walked in.

(2/9/23 Tr. 39:17-25).  Prior to entry, it was entirely reasonable to believe Garner was

living as a housemate or roommate at 606 North 17th Street—a situation which

would not have called for any greater specificity in the warrant application.  See

Durham, 254 F. App'x at 896.  We find there is no inherent inconsistency under

these circumstances between knowing Edwards was operating 606 North 17th

Street as a rooming house and identifying it as a single-family residence in the

application for the warrant.

   Moreover, Agent Stewart did nothing to hide what she knew of 606 North

17th Street's status as a rooming house from Judge Carlson.  Cf. Laury, 2022 WL

17091120, at *2 (citing Garrison, 480 U.S. at 85); see also Ritter, 416 F.3d at 266

(Garrison, 480 U.S. at 85-86).  Agent Stewart included CS-8's averment describing

Garner as renting a room in a rooming house in the affidavit and a description of

the jailhouse phone call in which Garner implies he is renting a room from

Edwards.  (See Doc. 299-1, Ex. 1B ¶¶ 27, 65).  This is the sum and substance of Agent

Stewart's information identifying 606 North 17th Street's as a rooming house.  (See

2/9/23 Tr. 34:22-35:16, 39:21-22).  We note that Agent Stewart and her colleagues made reasonable and diligent inquiry into the status of 606 North 17th Street as a single-family or multi-unit residence.  Cf. Garrison, 480 U.S. at 85 & n.10; Laury, 2022 WL 17091120, *2 (quoting Ritter, 416 F.3d at 266).  Agent Stewart checked city records which categorized the structure as a single-family residence, (see 2/9/23 Tr. 6:22-7:12, 13:15-17, 13:23-14:10, 40:19-22), and when surveilling the home, found it lacked external indicia of a multi-unit residence, (see id. at 13:18-22); cf. United States v. Kyles, 40 F.3d 519, 524 (2d Cir. 1994) ("Factors that indicate a separate residence include separate access from the outside, separate doorbells, and separate mailboxes." (citing Ayers, 924 F.2d at 1480; United States v. Hinds, 856 F.2d 438, 441-42 (1st Cir. 1988)).  Agent Stewart and Judge Carlson could have considered the information available to them and reasonably concluded 606 North 17th Street was a single-family residence.  Nothing in the affidavit or adduced at the hearing evinces Agent Stewart failed to describe the structure as it was known to her or failed to make an adequate inquiry into the building's status.  See Ritter, 416 F.3d at 266.  We will deny Garner's motion to suppress on this basis.

### C.   Execution

Lastly, Garner insists investigators violated the Fourth Amendment during the warrant's execution when they searched the entire residence after discovering 606 North 17th Street was a multi-unit dwelling.  (See Doc. 299 at 4-6 (citing Garrison, 480 U.S. 79; Ritter, 416 F.3d 256); Doc. 435 at 9-10).  In Garrison, the Supreme Court held when officers executing a validly issued warrant targeted at a single residential unit discover after entry the location contains multiple dwelling

units, the officers can no longer reasonably rely on the particularity of the warrant.
See Garrison, 480 U.S. at 86-87; Ritter, 416 F.3d at 266-67.  The Court explained the
officers have a duty from the moment of revelation forward to "either limit the
search to those areas clearly covered by the warrant or to discontinue entirely their
search" while they obtain a new, more particularized warrant.  See Ritter, 416 F.3d
at 266 (citing Garrison, 480 U.S. at 87).  If the officers continue searching, evidence
obtained after they knew or should have known the location contained multiple
units is inadmissible.  See id. at 267-68; see also Garrison, 480 U.S. at 87-88.

The government concedes 606 North 17th Street was a multi-unit dwelling at
the time of the search.  (See Doc. 436 at 13).  The question thus becomes when
officers executing the search warrant should have realized 606 North 17th Street
was actually a multi-unit dwelling rather than a single-unit dwelling as described in
the warrant.[7]  As we have already noted, courts emphasize access from the outside,
doorbells, and mailboxes as being especially indicative of multi-unit status.  Courts
also occasionally look to the presence of appliances and other items needed "for

---

[7] The government argues the good-faith exception should protect the
evidence gathered from 606 North 17th Street from suppression under Garrison.
Applicability of the good-faith exception as articulated in United States v. Leon, 468
U.S. 897 (1984), to warrants executed in violation of Garrison is unclear.  Compare
Hargraves, 2022 WL 499864, at *22 n.5 (suggesting "Leon and Garrison
independently govern within their distinctly different realms"), with United States
v. Pimentel, 26 F.4th 90-91 (1st Cir. 2022) (holding Leon applies).  We view this as a
distinction without a difference in this situation.  Garrison and Leon both carve out
similar exceptions for reasonable mistakes, see Garrison, 480 U.S. at 87 & n.11;
Leon, 468 U.S. at 922-23, and courts agree the proper inquiry in situations like the
one sub judice is whether officers reasonably believed the target location was a
single-family residence, see Ritter, 416 F.3d at 266-68 (applying Garrison alone);
United States v. Williams, 917 F.2d 1088, 1092 (8th Cir. 1990) (same); Pimentel, 26
F.4th at 91-92 (applying Garrison and Leon).

independent living," <u>see, e.g.</u>, <u>United States v. Ferreras</u>, 192 F.3d 5, 11 (1st Cir. 1999), and multiple garbage cans, <u>see</u> <u>Hargraves</u>, 2022 WL 499864, at *15 n.3.  The existence of deadbolt locks on interior doors suggests separateness, <u>cf.</u> <u>Pimentel</u>, 26 F.4th 86, 91-93 & n.6 (officers had a good faith belief search warrant included apartment on third floor, in part, because they "did not have to open any locked doors to access the third-floor unit"); deadbolt locks are rarely found on the interior doors of single-family residences.  But courts view a locking door alone as insufficient to render a bedroom a separate dwelling.  <u>See</u> <u>Kyles</u>, 40 F.3d at 523-24; <u>United States v. Cecchetelli</u>, 573 F. Supp. 3d 452, 457-58 (D. Mass. 2021); <u>see also</u> <u>United States v. Blackwood</u>, 904 F.2d 78, 1990 WL 78160, at *2 (D.C. Cir. June 11, 1990) (unpublished table decision).  Case law touching upon the presence *vel non* of numbers on interior doors is scant and largely inapposite to the facts of record.  <u>See</u> <u>Williams</u>, 917 F.2d at 1089, 1091-92 (numbers "placed at the extreme top of the door" and "easily overlooked" did not render unreasonable belief location was single-family residence); <u>United States v. Greathouse</u>, 297 F. Supp. 2d 1264, 1274-75 (D. Or. 2003) (belief location was single-family residence unreasonable despite "no lock on the door, no number and no separate door bell").  Taking this mixed case law into consideration, we view the conspicuous door numbers as indicative of multi-unit status but no more decisive than separate doorbells or mailboxes.

The search of 606 North 17th Street took place in two phases—the security sweep conducted by the entry team and then the thorough search conducted by Agent Stewart and her team.  There was nothing problematic about the team from the Pennsylvania State Police entering the common areas of 606 North 17th Street

since they did so pursuant to a facially valid warrant.  <u>See</u> <u>Ritter</u>, 416 F.3d at 266.
The record is silent as to whether the entry team noticed the numbers on the doors
or any other indicia of multi-unit status before entering the individual rooms during
the security sweep.  But even assuming *arguendo* they saw the door numbers and
deadbolts during their security sweep of the premises, (<u>see, e.g.</u>, Def. Exs. 2-5;
Before Rec. 00:36; After Rec. 01:07-1:08, 01:23-01:25, 01:28-01:29), the fact remains
606 North 17th Street lacked any of the traditional, external indicia of being a multi-
unit dwelling like separate entrances or multiple mailboxes,  (<u>see</u> 2/9/23 Tr. 13:18-22,
39:3-8; Before Rec. 02:11; After Rec. 00:03-00:07); <u>see also</u> <u>Kyles</u>, 40 F.3d at 524.
There is no indication the entry team spoke with the occupants of 606 North 17th
Street in any substantive way, and the mere presence of multiple residents alone is
not indicative a dwelling is multi-unit.  <u>See</u> *supra* pp. 13-14.  Nor would the layout of
the bedrooms give notice of the residence's multi-unit status because they lacked
appliances or other evidence of independent living.  <u>See</u> <u>Ferreras</u>, 192 F.3d at 11.  In
sum, the entry team would have been aware of only limited indicia 606 North 17th
Street was—despite its designation as a single-family residence in the warrant and
appearing to be a single-family residence from the outside—a multi-unit dwelling.

On the instant record, we cannot say the entry team should have known the residence was multi-unit prior to completion of the security sweep.[8] In the unique factual circumstances of the instant matter, the officers' security sweep necessarily took priority over weighing the significance of numbers or locks with regard to the location's status as a multi-unit dwelling. See Garrison, 480 U.S. at 87 & n.11 ("[T]he Court has . . . recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants."). And evidence observed in plain view during the sweep is admissible. See Ritter, 416 F.3d at 267 & n.11. Therefore, we

---

[8] Garner does not challenge the manner or scope of the entry team's security sweep. Officers are permitted to conduct security sweeps incident to executing a search warrant as long as they are lawfully present, possess a reasonable suspicion the area to be swept contains someone posing a danger to those on the scene, and limit their search temporally (no longer than necessary) and spatially (to places where a person may be found). Cf. United States v. Chalas-Felix, 424 F. Supp. 3d 316, 324-27 (D. Del. 2019) (collecting cases); see also United States v. Starnes, 741 F.3d 804, 808, 810-11 (7th Cir. 2013) (same). The entry team was executing a no-knock warrant targeted at a drug-trafficking operation linked to shootings and suspected to be storing weapons in 606 North 17th Street. (See Doc. 299-1, Ex. 1A, at 2; Doc. 299-1, Ex. 1B ¶¶ 4-6, 7(c), 51). A security sweep was an absolute necessity under these circumstances.

will deny suppression of the handgun and AK-47 found during the security sweep of Room 4.[9]

Agent Stewart's search team, however, had time to assess the situation after entry. They noticed the numbers on the doors, (see 2/9/23 Tr. 15:20-21, 19:13-14), and spoke with residents who asserted they rented separate rooms, (see id. at 15:24-25, 16:2-3, 27:23-25; Doc. 299-1, Ex. 2 at 67). The government concedes "after the search team spoke with the occupants of the property, it became clear that the property was an unregistered multi-unit dwelling." (See Doc. 436 at 13). At that juncture, Ritter required Agent Stewart and her team "to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search" while they obtained a more precise warrant. See Ritter, 416 F.3d at 266-67. They

---

[9] In Ritter, our court of appeals directed the district court, on remand, to ascertain which evidence the entry team observed before realizing the dwelling was multi-unit. See Ritter, 416 F.3d at 267. In a footnote, the court observed that evidence found in plain view during the security sweep would be admissible, but posited that a firearm found in the defendant's closet "clearly should be suppressed." See id. at 267 n.11. We construe this declaration to be nonbinding *obiter dictum*. It is unsupported by a factual foundation and is difficult to reconcile with case law allowing officers to conduct protective sweeps as long as they possess reasonable suspicion "the area to be swept harbors an individual posing a danger to those on the arrest scene." See Maryland v. Buie, 494 U.S. 325, 334-36 (1990); United States v. White, 748 F.3d 507, 512 (3d Cir. 2014) ("Like our sister circuits, we see no reason to impose a bright line rule limiting protective sweeps to in-home arrests." (quoting Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir. 1997)). The consensus among courts, both within our circuit and among other courts of appeals, is security sweeps may extend to any location within a dwelling in which officers have reasonable suspicion to believe an individual posing a threat could be hiding—including closets. See United States v. Porter, 438 F. Supp. 2d 554, 557-58, 560 & n.15 (E.D. Pa. 2006) (citing Buie, 494 U.S. at 327), aff'd on other grounds, 281 F. App'x 106 (3d Cir. 2008) (nonprecedential); United States v. Warren, No. 17-183, 2020 WL 134146, at *3-4 (W.D. Pa. Jan. 13, 2020); see also, e.g., United States v. Taylor, 248 F.3d 506, 512-14 (6th Cir. 2001) (permitting sweep of closet); United States v. Paopao, 469 F.3d 760, 767 (9th Cir. 2006) (permitting sweep behind sofa).

did neither.  Accordingly, we are obliged to suppress the evidence obtained from 606 North 17th Street after the residents informed investigators of the nature of their living situation.[10]  We will partially grant Garner's motion on this basis.

**III.**   **Conclusion**

For all these reasons, we will grant in part and deny in part Garner's motion to suppress evidence gathered from 606 North 17th Street on August 15, 2019.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   June 2, 2023

---

[10] The government argues we should not suppress the video footage captured by Edwards' security cameras because the footage depicts only the exterior and common areas of 606 North 17th Street.  (See Doc. 436 at 8).  We agree Garner lacks a privacy interest in the common areas, see United States v. Correa, 653 F.3d 187, 191 (3d Cir. 2011), but we read Ritter to require suppression of evidence obtained after investigators realized 606 North 17th Street was a multi-unit dwelling, regardless of whether the evidence was located in common or private areas, see Ritter, 416 F.3d at 267, 269 ("That which the District Court finds that members of the entry team observed in the shared or common areas of defendants' residence—*before they concluded that the residence actually comprised multiple apartments*—will dictate what evidence, if any, should avoid suppression.").  The moment of revelation appears to be a hard stop on admissible evidence recovered during execution of the warrant.  Security camera footage was not recovered from one of the common areas or discovered during the security sweep; it was found in Room 3 via a search which took place, like the search of Room 4, after the government concedes investigators knew the dwelling was multi-unit.  (See 2/9/23 Tr. 21:17-19; Doc. 299-1 at 68; Doc. 436 at 13).  The footage is inadmissible absent a distinct and independent basis for admission.